708 S.E.2d 626 (2011)
In the Interest of R.J. et al., children (two cases).
Nos. A10A1857, A10A1858.
Court of Appeals of Georgia.
March 24, 2011.
*627 H. Brannen Bargeron, for appellant (case no. A10A1857).
Marnique W. Oliver, for appellant (case no. A10A1858).
*628 Thurbert E. Baker, Atty. Gen., Shalen S. Nelson, Senior Asst. Atty. Gen., Thomas Joseph O'Donnell, Asst. Atty. Gen., for appellee.
DOYLE, Judge.
A Jefferson County Juvenile Court terminated the rights of the biological parents of R.J. and J.G. The court also denied the mother's motion for new trial. In Case No. A10A1857, the mother challenges the denial of her motion for new trial and argues that the juvenile court erred by failing to make sufficient findings of fact and conclusions of law in its termination order. In Case No. A10A1858, the father challenges the sufficiency of the evidence to support the termination and the juvenile court's determination that the termination was in the best interests of the children. For the reasons that follow, we affirm.
On appeal from an order terminating parental rights, we must determine whether, after reviewing the evidence in a light most favorable to the [juvenile] court's judgments, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the [juvenile] court's factfinding and affirm unless the appellate standard is not met.[1]
So viewed, the record shows that the mother and father are step-siblings who began a romantic relationship prior to reaching the age of majority after the mother's biological mother ("grandmother") and father's biological father ("grandfather") were married. The mother gave birth to R.J. in 1999 when she was 17, and the parents moved to Georgia when the mother was 19, leaving R.J. in his grandmother's care in South Carolina because the mother did not feel her situation in Georgia "was[ ] stable enough to [take R.J.] with" her. During this time, the mother gave birth to J.G. in March 2003. In May 2003, the grandmother died, and the parents traveled to South Carolina to retrieve R.J. from the grandfather, who initially refused to allow the parents to take the child, but later relinquished custody to them after the local police became involved. The mother stated that the father's biological mother informed her that the grandfather had previously molested other individuals.
At the time the parents returned with R.J. to Georgia, they claimed R.J. had been prescribed phenobarbital. The parents believed this was the result of an accidental head injury R.J. sustained while living with his grandfather. Upon returning to Georgia, the parents visited Dr. Ford to refill R.J.'s prescription; however, because R.J. was not covered by Medicaid and the father was covered, the parents testified that Dr. Ford prescribed the phenobarbital in the father's name.
That June, the mother was at home alone with the children one evening when she administered R.J.'s dose of phenobarbital around 9:00 p.m. She stated that she went to the restroom, and when she returned, she claimed to have discovered R.J. with the medication bottle in his bedroom. She claimed that he took more of the medicine while she was out of the room, and he later exhibited drowsiness, slurred speech, and other symptoms, but she believed those were typical for the medication. The mother did not contact poison control or emergency services, but kept R.J. awake until the father returned from work approximately two hours after the event. Upon the father's return from work approximately one-and-a-half or two hours later, the mother told him what had happened, and he contacted an Ask-A-Nurse line, seeking information and advice on a course of treatment for the child. The father thereafter contacted emergency services. When help arrived at the home, R.J. was not responsive.
While at the hospital, authorities noticed bruising on R.J., which was eventually discovered to be the result of corporal punishment inflicted on the child by the mother with a belt. The mother initially denied any *629 physical punishment of the child, and the father, though aware that she had hit R.J. with a belt, also lied to investigators about the cause of the bruising. The father later conceded that he had seen the mother whip R.J. with a belt, and he had witnessed her yell at R.J. until he had to intervene.
Thereafter, the children were removed from the parents, and a juvenile court found that the children were deprived due to lack of proper parental control. The Department of Family and Children Services ("the Department") developed a reunification case plan, requiring the parents to, inter alia, obtain and maintain an income source and obtain and maintain suitable housing.
On May 27, 2005, a juvenile court entered an order extending the Department's custody of the children because the parents had failed to comply with the reunification plans. The Department filed a motion for nonreunification on September 23, 2005, alleging that the parents had failed to establish stability in employment and housing, and while they visited J.G. weekly, the parents had visited R.J. only twice over several months. The Department then filed an updated case plan requiring the parents to (1) maintain a source of income; (2) maintain stable housing; (3) complete psychological evaluations; (4) demonstrate they could employ nonharmful discipline methods; and (5) meet the children's needs.
In June 2006, a juvenile court entered an order finding that the children could not be returned to the parents because the goals of the new case plan had not been completed, and the Department thereafter filed a petition to terminate the parents' rights.
In November 2006, the Juvenile Court of Glascock County, which had been overseeing the case, transferred the matter to Jefferson County, from which the current appeals arise. After the transfer, the Department filed a new deprivation petition because the parents had not completed their case plan and neither was employed. The parents stipulated to an extension of custody with the Department, and on December 14, 2007, the Department filed a new petition to terminate the parents' rights, alleging that (1) sexual abuse allegations, including that the parents made R.J. perform oral sex on J.G., had been substantiated, and (2) R.J. continued to maintain that the mother had made him ingest the phenobarbital.
At the hearings on the termination proceedings, psychologist Latonya Wright testified that she performed a sexual trauma evaluation on R.J. on October 10, 2007, which revealed a probable history of sexual abuse and ambivalence toward the father and grandfather. R.J. reported to Wright sexual abuse by other children in his special education class, reported watching J.G. using the restroom, exhibited distorted sexual beliefs, and reported that his grandfather had kissed him on the lips, which made him feel bad. Additionally, Wright testified that R.J.'s evaluation suggested that he probably had sexual contact with J.G. because "he believed that sexual contact between children should be allowed"; R.J. also spontaneously stated that he did not touch anything when he watched J.G. use the restroom, which Wright explained was an inappropriate response for a child. R.J. indicated to her that he did not live with the mother because she gave him "the wrong pill."
Psychologist Jeffrey Dulin testified regarding a psychological and psycho-sexual evaluation he performed on the mother over a period of two years. Dulin opined that the mother's response to R.J.'s overdose was inappropriate, that she did not blame herself for the event, that she denied any abuse of R.J., and she was a high risk for untruthfulness. Dulin reported no improvement in the mother's frustrations or maturity over the course of the two years he conducted his evaluation, and he found that her major weaknesses included: (1) acknowledging the children's feelings, (2) struggling with immaturity and inappropriate frustration, and (3) abusive tendencies when under stress. Dulin also opined that the mother had possible homicidal intent toward R.J., that any child would be at risk for physical abuse in her care, and that any treatment plan would have to be extensive and would likely be ineffective.
Dulin testified that the father's response to R.J.'s overdose was appropriate, but the father *630 admitted to Dulin that he was aware that the mother physically disciplined R.J. Dulin also testified that while the father knew the grandfather was a registered sex offender, he still allowed R.J. to stay in his home. Dulin concluded that while the father may have been capable of caring for the children, it would not be in their best interest to be placed with him while the mother lived with him.
Jane Dansy, guardian ad litem for the children from May 2004 until October 2006, testified that R.J. disrupted three foster placements before going to a treatment center and then to a therapeutic placement, where he remained at the time of the hearing and where he was showing great improvement. She testified that the parents visited the children sporadically and attended to J.G. more than R.J. when they did visit, and the parents had not completed their case plan. Dansy testified that R.J. told the Department that the mother made him overdose on the medication, and R.J. and J.G. had both acted out sexually in foster care. Dansy testified that neither the father nor the mother were intellectually or emotionally equipped to care for R.J.
Linda Story, case manager for the children in 2004 and again in 2007, testified that R.J. told her that when the mother gave him the overdose, she told him that she wished he would die. Story's assessment of the parents' home based on her evaluations was that it was not suitable for children because it was near a busy highway, had inadequate heating, and contained excessive clutter or items that were in disrepair. Additionally, she testified that the parents' living situation had never been stable, the mother was unemployed and paid very little child support, and the parents were behind on their rent in their current home. She testified that the father had been employed for approximately six months and was not consistent with paying child support. Story recommended terminating the parents' rights, explaining that both children were doing well in their respective environments, the parents were still unstable and had inadequate housing, R.J. had not acted out sexually since 2006, the children had been in foster care for a long time, and the children needed permanent placement to avoid any negative effect of longterm fostering.
Glenda Clegg, R.J.'s therapeutic foster parent for approximately three years, testified that she was specially trained to deal with his issues, which included hyperactivity, sexual dysfunction, social dysfunction, lying, and aggression. Clegg was not adopting R.J., but she had met the couple that planned to adopt him in the event his parents' rights were terminated. J.G.'s foster parent testified that she had cared for him about a year and a half, that he was doing well, and that she wished to adopt him in the event the court terminated the parents' rights.
The father's biological mother, J.M., testified that she had witnessed visits between the parents and children, and the visits were always appropriate. On a previous occasion, J.M. told the Department home evaluator that she believed that the mother gave R.J. the phenobarbital because the mother was not capable of handling the needs of a baby and a special-needs child, but J.M. believed that the children would be safe with the parents at this time. J.M. thought that the father should be given custody, but she thought that the mother was easily overwhelmed and should probably not care for the children while the father was at work.
The father testified that he was ordered to pay $310 in child support per month and was not current at the time of the hearing, and he also stated that he and the mother were $100 behind on their rent payment at that time. The father testified that he still lived with the mother, but would ask her to leave the home if the juvenile court instructed him to do so.
On July 20, 2008, the juvenile court entered an order terminating the parents' rights to R.J. and J.G. The mother filed a motion for new trial, which was denied on February, 11, 2009. These appeals followed.
A termination of parental rights case involves a two-step analysis. First, the juvenile court must find parental misconduct or inability, based on clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the *631 cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[2] "If these four factors are satisfied, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home."[3]
1. The children are deprived. Because the parents did not appeal the juvenile court's order finding R.J. and J.G. deprived, and because the evidence showed that the conditions upon which these findings were based still existed at the time of the termination hearing, the parents are bound by these findings and may not challenge the juvenile court's finding of deprivation.[4]

Case No. A10A1857
2. As addressed below, sufficient evidence exists as to support the juvenile court's findings of the mother's parental misconduct or inability.
(a) Lack of parental care or control caused the deprivation. The mother does not challenge the juvenile court's finding that lack of parental care or control caused the deprivation, and our review of the record reveals no error in the juvenile court's determination that lack of care or control on the mother's part led to the deprivation of the children.
(b) The cause of the children's deprivation is likely to continue.
Evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child; clear and convincing evidence of present unfitness is required. But the trial court is entitled to consider evidence of the [parent']s past actions in determining whether the deprivation is likely to continue. It is not bound by mere promises to do better in the future.[5]
The mother contends that the juvenile court erred by finding that there was clear and convincing evidence that the deprivation was likely to continue or not be remedied, pursuant to OCGA § 15-11-94(b)(4)(iii). We disagree.
Dulin testified that the mother had not improved over the course of the two years that he evaluated her, and he opined that any child in her care was at risk of being harmed by her. Additionally, the mother visited the children sporadically, and she favored J.G. over R.J. She failed to obtain employment or adequate housing and failed to pay child support for the children. J.M. testified that, although she believed that the mother would do a better job now that the children were not as young, she also opined that the mother should not watch the children alone while the father was at work. R.J.'s therapeutic foster parent testified that, while he has improved, he still has many special-needs issues, which likely will produce a stressful situation for his caregiver. Thus, construing the evidence in favor of the Department, the finding that the deprivation of the children by the mother is likely to continue is supported by the record.
(c) Continued deprivation is likely to cause serious harm to the children. Next, the mother contends that the juvenile court erred by finding that the continued deprivation would cause serious physical, mental, emotional, or moral harm to the child, pursuant to OCGA § 15-11-94(b)(4)(iv). Again, we disagree.
As stated above, Dulin testified that a child in the mother's care was likely to suffer harm because she has shown no improvement in her ability to deal with stress related to caring for a child, and J.M. testified that the children should not be left in their mother's care alone because she would likely injure them. In addition to this testimony, "the *632 juvenile court was authorized to consider the children's need for a stable home situation and the detrimental effects of prolonged foster care."[6] Here, the children have been in foster care since 2004, and the testimony at the termination hearings established that J.G.'s current foster parents wished to adopt him, and R.J.'s therapeutic foster parent had met his prospective adoptive parents. Thus, the children have an opportunity to achieve permanent homes.
3. Best interests of the children. The mother challenges the trial court's finding that termination is in the best interests of the children, but she provides argument only as to R.J. She contends termination is not in R.J.'s best interests because R.J. is not adoptable, adoption would sever R.J.'s relationship with J.G., and any adoptive parents would have to deal with R.J.'s special needs. Although the mother is correct that R.J.'s adoptive parents likely would endure a great deal of stress raising him, the record evidence supports the trial court's determination that the mother is not capable of adequately providing for R.J.'s care, and it is therefore in his best interest to have her rights terminated so that he has the opportunity to establish a permanent bond with an adoptive family capable of meeting those needs.
"The same factors which illustrate a parent's inability to properly parent her children may also provide proof that termination of parental rights will be in the children's best interests."[7] The facts as addressed above support the trial court's conclusion that termination of the mother's rights was in the best interests of the children. Additionally, both R.J. and J.G. have prospective adoptive families and have greatly improved since entering foster care. Under these circumstances, we find no error in the trial court's determination.
4. The mother contends that the children's interests were not adequately represented before the juvenile court because they were not represented by an attorney. Pretermitting whether the mother has standing to raise this issue, the children were represented by an appointed guardian ad litem, which is specifically provided for by the legislature in OCGA § 15-11-98(a).[8] Moreover, testimony was provided to the trial court that the children asked to return to their parents, which is the testimony the mother contends that an appointed attorney would have produced. Accordingly, the mother has failed to establish any harm.[9]
5. The mother contends that the juvenile court erred by failing to issue an order containing appropriate findings of fact and conclusions of law. This enumeration is without merit, however, because the court's order explicitly made the appropriate findings to support its legal conclusions under OCGA § 15-11-94(b)(4)(A).[10]

Case No. A10A1858
6. As addressed below, sufficient evidence exists as to support the juvenile court's findings of the father's parental misconduct or inability.
(a) Lack of parental care or control caused the deprivation. The father does not challenge the juvenile court's finding that lack of parental care or control caused the deprivation, and our review of the record reveals no error in the juvenile court's determination that lack of care or control on the father's part led to the deprivation of the children.
(b) The cause of the children's deprivation is likely to continue. "In determining whether . . . deprivation is likely to continue, the juvenile court is authorized to consider the past conduct of the parent." [11] *633 The father argues that the juvenile court's finding was based largely on R. J.'s 2004 phenobarbital overdose, but the father contends that this is not sufficient to support the finding. The father instead contends that his reaction to the incident, including calling paramedics, was appropriate. Nevertheless, the father was involved in procuring under a false prescription the phenobarbital, and he administered the drug to his child without a clear understanding of why it was being prescribed. The father also attempted to cover up evidence of the false prescription.
Moreover, for the past four years, the father has failed to maintain stable housing or work, and he has not regularly supported the children.
[T]he trial court was also authorized to assign less weight to assertions of sudden parental fitness based on belated efforts to comply with a case plan after termination proceedings begin. The decision as to the children's future must rest on more than positive promises which are contrary to negative past fact.[12]
While the father testified that he would leave the mother if the juvenile court so instructed, he continues to co-habitate and maintain a relationship with her, even though it is clear from the evidence presented to the juvenile court that the mother poses a risk to any child left in her care. When the children were in their custody, the mother physically disciplined and yelled at R.J. but the father did not intercede on the child's behalf. The father also lied to authorities about the source of the bruising found on R.J. in order to protect the mother.[13]
(c) Continued deprivation is likely to cause serious harm to the children. Clear and convincing evidence also supports the trial court's finding that the deprivation is likely to cause serious harm to the children. In addition to the father's failure to protect the children from the mother, he has failed to establish a stable home and job during all but the very most recent months of the four years that the children have been in foster care. As stated above, the juvenile court was authorized to consider the children's needs for permanency and stability as well as the detrimental effects of prolonged foster care when making this determination.[14]
7. Best interests of the children. For the reasons discussed in Divisions 3 and 6, there was clear and convincing evidence that the trial court's termination of the father's rights was in the best interests of the children.
8. Finally, because clear and convincing evidence supports the termination order as to the mother and father, it follows that the trial court did not err in denying the mother's motion for new trial.
Judgment affirmed.
ELLINGTON, C.J., and ANDREWS, J., concur.
NOTES
[1] (Punctuation omitted.) In the Interest of S.N.H., 300 Ga.App. 321, 321-322, 685 S.E.2d 290 (2009).
[2] See OCGA § 15-11-94(b)(4)(A).
[3] (Footnotes omitted.) In the Interest of S.N.H., 300 Ga.App. at 325(1), 685 S.E.2d 290.
[4] See, e.g., In the Interest of K.C.W., 297 Ga.App. 714, 718(2)(a), 678 S.E.2d 343 (2009).
[5] (Citation and punctuation omitted; emphasis in original.) In the Interest of J.T.W., 270 Ga. App. 26, 33(2)(c), 606 S.E.2d 59 (2004).
[6] (Punctuation omitted.) In the Interest of A.M., 259 Ga.App. 537, 543, 578 S.E.2d 226 (2003).
[7] In the Interest of D.H., 243 Ga.App. 778, 784, 534 S.E.2d 466 (2000).
[8] See In the Interest of A.P., 291 Ga.App. 690, 691-692(1), 662 S.E.2d 739 (2008).
[9] See In the Interest of M.T.C., 267 Ga.App. 160, 162, 598 S.E.2d 879 (2004).
[10] Compare In the Interest of M.D.F., 263 Ga. App. 50, 52, 587 S.E.2d 199 (2003).
[11] In the Interest of D.M.K., 302 Ga.App. 168, 172(1), 690 S.E.2d 481 (2010).
[12] (Citations and punctuation omitted.) In the Interest of D.H., 243 Ga.App. at 783, 534 S.E.2d 466.
[13] See id. at 784, 534 S.E.2d 466.
[14] See In the Interest of A.M., 259 Ga.App. at 543, 578 S.E.2d 226.