A02A0851. IN THE INTEREST OF B. F., a child.
(570 SE2d 385)

POPE, Presiding Judge.

The mother of B. F. appeals following the termination of her parental rights. The termination hearing in this case addressed the parental rights of both the father and mother of B. F. In a related appeal, this Court reversed the termination of the father's parental rights because we found that there was insufficient evidence of some of the factors necessary to support a finding of parental misconduct. *In the Interest of B. F.*, 253 Ga. App. 887 (560 SE2d 738) (2002). Because we find that there is also insufficient evidence to support some of these factors with regard to the mother, we reverse.

> In determining whether a termination of parental rights is supported by sufficient evidence, we construe [the] evidence and all reasonable inferences from it in a light most favorable to the trial court's ruling and ask whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights had been lost.

(Citation omitted.) *In the Interest of J. E. L.*, 223 Ga. App. 269 (1) (477 SE2d 412) (1996).

Viewed in that light, the evidence relating to the mother at the termination hearing showed that the mother and father separated in 1997, when B. F. was nine years old. Although the mother initially had her daughter with her, B. F. remained with his father. The mother later asked the father to keep the daughter for a period. For a time, the mother visited the children on weekends and holidays. But at some point in late 1997 or early 1998, the mother came and took the daughter while a babysitter was watching her and left B. F. with his father. She stated that she left B. F. behind because he had such a strong bond with his father and that she did not think that the child "would be able to handle it without him." Her initial plan was to live in the same town with the father and B. F., so that the parents could visit each child, but her husband at the time interfered with that plan because he did not get along with B. F.'s father. The mother subsequently lost touch with B. F. and his father after they moved. The

mother testified, however, that she made numerous efforts to try and locate them, including visiting places where she learned they had lived, contacting tree services in the area where her husband may have been employed, and asking the Cobb County police for assistance. She stated that she did not see B. F. from December 1997 until she learned that he was in the custody of the Department of Family & Children Services in March 2000.

B. F. first came into the custody of the Cobb County DFACS in February 1999 when the father was arrested on a charge of driving with a suspended license. At the time the mother's whereabouts were unknown. B. F. was initially placed in a foster home, but in August 2000 he went to live with his paternal grandparents. A DFACS caseworker testified that B. F. was doing very well after coming to live with his grandparents. He was taken off the Ritalin he began receiving while in foster care and appeared to be focused and excited about school. He was receiving counseling, as well as tutoring for two classes in which he needed extra help.

The mother learned that B. F. was in DFACS custody in March 2000. At the time of the hearing, the mother had visited B. F. once in the seven months that she had been aware of the child's situation, although she testified that she had made other attempts to arrange visitation. She also stated that she had tried calling him and left messages on the answering machine, but that her calls were never returned.

At the time of the hearing, the mother was employed as a housekeeper and night auditor for the hotel where she lived, and she worked seven days per week. The daughter was in the custody of the Bartow County DFACS. The child was placed into custody after the mother was arrested for a probation violation in November 1999, for which the mother served 26 days in jail. The mother was working with DFACS on a reunification plan with her daughter, but had not met all of the plan's requirements. Cobb County DFACS never prepared a reunification plan for the mother and B. F.

The mother testified that she was having trouble regaining custody because she could not find a residence that met with DFACS' approval. Although she stated that the hotel where she lived was clean, safe, and on a school bus route, the evidence showed that the juvenile judge in that case had ordered her not to live in a motel. The mother had applied and been approved for subsidized housing in Whitfield County, but after the Bartow County DFACS caseworker told the housing office that the mother did not have custody of her daughter, the mother was informed that she was not eligible for housing. She also testified that she was looking for another job that would allow her to make child support payments for her daughter, which had recently been required by DFACS.

The mother said that she had trouble meeting some of the other requirements of her case plan because they required transportation between her home in Whitfield County and Bartow County, and that her car had been inoperable. She testified, however, that she had just gotten a new car. The mother said she lived in Whitfield County and away from Bartow County because she was afraid of her husband and did not want him to know where she was. She stated that she planned to institute divorce proceedings against her husband.

The child's paternal stepgrandmother testified that B. F. was living with her husband and her at the time of the hearing. She stated that the child had lived with them previously in 1995 "when neither parent was available." At that time, they were called in the middle of the night to pick up B. F. and A. F. by the Cobb County police. They kept them for several months, and during that time the mother never contacted them. The stepgrandmother testified that B. F.'s current stay with them was going well and that she believed that he would benefit by staying longer. Prior to the current stay, the grandparents had not known for four years where their grandchildren were.

At the close of the evidence, B. F.'s guardian ad litem stated that she could not recommend the termination of the mother's parental rights at that time because she could not say it was in the child's best interest.

In determining whether the termination of parental rights is warranted under OCGA § 15-11-94, the juvenile court employs a two-prong analysis. "First, the court determines whether there is clear and convincing evidence of parental misconduct or that the parent is unable to care for and control the child. Second, the court determines whether termination is in the best interest of the child." (Citation omitted.) *In the Interest of S. H. P.*, 243 Ga. App. 720 (534 SE2d 161) (2000).

And a finding of parental misconduct requires clear and convincing evidence of the following four factors:

1) that the child is deprived; 2) that the cause of the deprivation is a lack of proper parental care or control; 3) that the cause of the deprivation is likely to continue or will not likely be remedied; and 4) that the continued deprivation is likely to cause physical, mental, emotional, or moral harm to the child. OCGA § [15-11-94] (b) (4) (A).

(Citation and punctuation omitted.) *In the Interest of J. M. B.*, 231 Ga. App. 875, 876 (501 SE2d 259) (1998).

In this instance, the mother is effectively bound by the trial court's prior finding that B. F. was deprived based, in part, upon the fact that the mother's whereabouts were unknown at the time of the

deprivation order. *In the Interest of L. S. F.*, 217 Ga. App. 478, 480 (458 SE2d 370) (1995).

Further, the evidence shows that the deprivation was caused, in part, by the mother's lack of proper parental care or control as she had no contact with the child for over two years and could not be located at the time of the father's arrest. In fact, she first learned of her child's whereabouts at the time she was served with the petition for termination.

But we believe that the trial court's finding that the deprivation is likely to continue is premature. See generally *In the Interest of V. S.*, 249 Ga. App. 502, 504 (548 SE2d 490) (2001). Only six months had passed from the time the mother was first contacted and the time of the deprivation hearing. Although the mother had not been in touch with B. F. for more than two years, the evidence was uncontradicted that she had attempted, within her means and circumstances, to locate the child and reestablish contact. Moreover, she had left B. F. in the care of his father, whom she believed was willing and able to provide for the child. And although she had only visited the child once in the six months since learning of his whereabouts, she explained that her car had not been operational for some time and she lived some distance from her children because she was afraid of her husband, who apparently lived in the area. Her attempts to talk to the child by phone had gone unanswered.

No case plan was ever devised to reunite the mother with B. F. And although she had failed to meet all of the requirements of the case plan for her daughter, the evidence showed that she had attempted to do so. Her attempts to establish a suitable home for her child were thwarted, in part, by the intervention of Bartow County DFACS when the caseworker contacted the Whitfield County Housing Office to inform them that the mother did not have custody of her daughter. As the guardian ad litem described it, the mother was caught in a "Catch-22" situation with regard to the housing. She needed to secure public housing in order to get custody of the children, but she could not get housing because she did not already have custody. Moreover, the mother was hampered, in part, in meeting other goals of the case plan by her lack of reliable transportation. In addition, the guardian believed that the child was bonded with his mother, despite her past actions.

Under these circumstances, although there is evidence of the mother's neglect of B. F. in the past, we cannot say that there is clear and convincing evidence that this neglect is likely to continue. See *In the Interest of A. A.*, 252 Ga. App. 167, 172 (2) (c) (555 SE2d 827) (2001). See also *In the Interest of V. S.*, 249 Ga. App. at 506 (1) (b).

And as we found in the father's case, "there is absolutely no evidence in the record that any continued deprivation is likely to cause

physical, mental, emotional, or moral harm to the child. There was no testimony that any potential or actual harm would result to B. F. from a continued relationship with his [mother] or that B. F. was suffering from being in foster care or that he would suffer if he did not find permanent placement." *In the Interest of B. F.*, 253 Ga. App. at 891-892.

Accordingly, we hold that the juvenile court's termination of the mother's parental rights must be reversed. See *In the Interest of D. F.*, 251 Ga. App. 859 (555 SE2d 225) (2001); *In the Interest of J. M.*, 251 Ga. App. 380 (554 SE2d 533) (2001).

*Judgment reversed. Ruffin, J., concurs. Barnes, J., concurs in the judgment only.*

DECIDED AUGUST 20, 2002.

*Culp & Smith, Robin M. Smith*, for appellant.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Assistant Attorney General, Sanders B. Deen*, for appellee.

