711 S.E.2d 5 (2011)
309 Ga. App. 51
In the Interest of J.E., a child.
No. A10A2363.
Court of Appeals of Georgia.
March 30, 2011.
*6 Lisa Lott, San Jose, CA, for appellant.
Thurbert E. Baker, Atty. Gen., Shalen S. Nelson, Sr. Asst. Atty. Gen., Penny Hannah, Asst. Atty. Gen., Kathryn A. Pope, Anniston, AL, for appellee.
ANDREWS, Judge.
On appeal from a juvenile court's order terminating a mother's parental rights as to her child, J.E., the mother argues that the evidence was insufficient in that the record did not show that the child's state of deprivation was likely to continue or that any continued deprivation would likely cause serious harm. See OCGA § 15-11-94(b)(4)(A)(iii), (iv). The mother also argues that the trial court failed to take account of the positive relationship between her and the child. We disagree with these contentions and therefore affirm.
Our responsibility as an appellate court is to determine

*7 whether, after reviewing the evidence in a light most favorable to the lower court's judgments, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met.
(Citations and punctuation omitted.) In the Interest of R.N., 224 Ga.App. 202, 480 S.E.2d 243 (1997).
So viewed, the record shows that on September 27, 2006, five days after J.E. was born, the Athens-Clarke County Department of Family and Children Services ("the Department") filed a complaint alleging that J.E.'s mother, who was homeless at the time, had used cocaine throughout her pregnancy and to induce labor, and that both mother and child had tested positive for cocaine at the child's birth. In October 2006, the Department filed a deprivation petition. After a hearing at which the mother stipulated to a finding of deprivation, the court awarded custody of J.E. to the Department. In March 2007, the juvenile court adopted the Department's case plan, which required the mother to secure steady employment and housing, to attend parenting classes, to undergo a psychological evaluation, to visit J.E. twice weekly, to complete a drug-treatment program including random drug screening, and to remain drug- and alcohol-free for six months. A complaint for child support was filed more than a year later, but was not served on the mother because she could not be located. The mother has never paid any child support.
In May 2007, the juvenile court reviewed the case and found that the mother had failed to find employment or housing, that she had dropped out of drug treatment within a month, and that she tested positive for cocaine in five out of six drug screens. In September 2007, the mother pled guilty to a shoplifting charge and was sentenced to 60 days in jail, 12 months probation, and 20 hours of community service, which was to be suspended if she successfully completed a rehabilitation program. After the mother failed to report to her probation officer, however, the state court issued an order to show cause why sentence should not be imposed.
The juvenile court again reviewed the case in June 2008, at which time the mother again consented to a finding of deprivation. Although the mother was in compliance with the drug-treatment program and had tested negative for drugs since January 2008, the juvenile court found that she had not made enough progress with her case plan, including drug treatment and housing, to warrant a change in custody.
The juvenile court held another status hearing on September 12, 2008. With the support of her case manager, J.E.'s mother had returned to Athens and was living in the residential component of an outpatient drug-treatment facility, Advantage Behavior Health Systems Women's Services ("Women's Services"), in order to be closer to J.E. The case plan incorporated into the juvenile court's order indicated that the mother had continued to have regular visitation with J.E. The case plan also noted, however, that the mother was not employed and had no suitable housing. The court again ordered that J.E. remain in her foster home.
In October 2008, the residential component of Women's Services lost its funding and shut its doors, leaving the mother without shelter. With the support of her case manager, the mother moved into a transitional living facility for recovering addicts called Freedom From Bondage ("FFB"), which required that she obtain employment within two weeks of moving in. FFB's policy further required that the mother pay a $200 entry fee and rent of $100 a week, attend two twelve-step recovery meetings a week, and abide by a curfew. After one month, the mother was asked to leave FFB because the only employment she was able to find required her to work evening hours in violation of the curfew and because she was unable to pay the entry fee and rent.
From mid-November 2008 through March 2009, J.E.'s mother lived in and out of homeless shelters and drifted between friends' apartments. Although she worked briefly as a cashier in a grocery store, she was terminated after the balance in her cash register *8 was short for two consecutive days. She was asked to submit to three drug screens but failed to do so.
In March 2009, the mother found employment at a fast-food restaurant but was laid off the following month for absenteeism. In April 2009, as she submitted strands of her hair for a drug test, she confessed to her case manager that she had used cocaine and marijuana since being out of treatment, and as recently as two weeks prior to the test. The test results confirmed the presence of cocaine.
On June 29, 2009, the Department filed a petition for termination of the mother's parental rights in J.E. The hearing on the petition was held on September 23 and October 23 of that year.
A psychologist had assessed the mother in February 2007, at which time she told him that although she was in outpatient rehabilitation, she needed an inpatient program because it would restrict her freedom and thus her risk of relapse, and that she had been under the influence of drugs during some of her visits to the child. After the mother failed to appear at several scheduled follow-up appointments, she returned for a second session, after which the psychologist concluded that she suffered from cocaine dependence with psychological dependence and that she needed inpatient rather than outpatient treatment.
When asked at the termination hearing about the possibility of relapse in light of the facts that the mother had tested positive for cocaine in April 2009, the psychologist responded: "The single best predictor of future behavior is past behavior, so if we're having an ongoing pattern of drug abuse or drug dependency, the likelihood is to continue." When asked about the mother's failure to obtain a steady job or housing, the psychologist said:
I would answer that similarly. If problems that were present when I first evaluated her continued to be present, ... those are not good prognostic indicators of the likelihood that they will improve in the near future. I'm not saying that they won't, just saying that they are not prognostically positive.
Under cross-examination, the psychologist admitted both the relevance of the mother's present bond with J.E., whom he had never met, and the possibility that the mother could stay sober permanently. But he also confirmed his judgment that the mother would likely be unable to overcome her drug addiction:
She understands what a good parent is, yet she's not able for some reason, or not willing[,] to make the changes that she prescribes. And so I don't necessarily judge her on it, but ... it sheds a light on how deep her problem[s] with drugs really are. And that shows to me that the April incident of '09 outweighs today being sober, although today being sober is a good sign and I like to see that.
The guardian ad litem filed her report on the day before the second session of the termination hearing. The guardian reported inter alia that the mother had told her outpatient provider that she had smoked marijuana and inhaled at least a gram of cocaine every day from January through mid-May 2009 and that J.E. was more affectionate with her foster mother than with her natural mother. The guardian concluded that the mother's parental rights in J.E. should be terminated.
The addiction counselor at the mother's inpatient service testified that during her residency, the mother had violated a number of policies designed to keep the residents drug-free. In August 2009, only six weeks before the termination hearing, the mother visited an emergency room for a heart complaint, called a man she knew to be a drug dealer to meet her there, and obtained $20 from him. During the same visit to the hospital, the mother complained of neck pain and, without authorization, obtained a prescription, never filled, for muscle relaxers.
Although there was some evidence that J.E. had previously had difficulties with her mother's visits, the juvenile court heard extensive testimony concerning the positive present relationship between the two, as well as the favorable conditions in the child's foster home, including that the foster mother *9 wished to adopt her permanently. The juvenile court then found as follows:
In spite of inconsistency in many areas of the mother's life, she has visited regularly with her child, and they have a positive relationship. [The case manager] testified that the mother and the child interact appropriately and in a healthy way. Two different times during this case, [however, the case manager] was on the verge of requesting overnight visits, but each time, [he] was unable to follow through with his plans because of the mother's circumstances. The mother is currently unable to provide the necessities of life for the child. The mother is in treatment for the fourth time, and this court would not be able to consider placing the child with her in a treatment program until there was demonstrable progress, which may take months. The child has never lived with this mother, or with any person other than her current foster parent.
(Emphasis supplied.) Later in its order, the juvenile court stated its legal conclusions that continued deprivation was likely, that such deprivation would likely cause serious harm, and that termination was in the best interests of the child. We granted the mother's application for a discretionary appeal.
1. In order to terminate a parent's rights as to a child, the juvenile court must find clear and convincing evidence of "parental misconduct or inability" in that
(i) The child is a deprived child, as such term is defined in Code Section 15-11-2;
(ii) The lack of proper parental care or control by the parent in question is the cause of the child's status as deprived;
(iii) Such cause of deprivation is likely to continue or will not likely be remedied; and
(iv) The continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.
OCGA § 15-11-94(b)(4)(A). When a child is no longer in the custody of a parent, a court evaluating the question of proper care and control "shall [also] consider" whether the parent
without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: (i)[t]o develop and maintain a parental bond with the child in a meaningful, supportive manner; (ii)[t]o provide for the care and support of the child as required by law or judicial decree; and (iii)[t]o comply with a court ordered plan designed to reunite the child with the parent[.]
OCGA § 15-11-94(b)(4)(C).
(a), (b) The mother does not dispute the juvenile court's conclusion that J.E. was deprived at the time of the termination hearing and that the deprivation was caused by the mother's lack of proper parental care or control. In the Interest of P.D.W., 296 Ga.App. 189, 191-193(1)(a), (b), 674 S.E.2d 338 (2009) (unappealed finding of deprivation and "further showing" that "the conditions upon which this finding was based still exist at the time of the hearing on the termination petition" was sufficient to show that the child was deprived; failure to complete case plan, to pay child support, and to obtain suitable income or housing for two years until after filing of termination petition was also sufficient to show a lack of parental care or control).
(c) As to whether the "cause of [a child's] deprivation is likely to continue," OCGA § 15-11-94(b)(4)(A)(iii), the question of how much weight should be given to a parent's recent improvements "is a question for the trier of fact. In considering a parent's claims of recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation." (Punctuation and footnote omitted.) In the Interest of A.T.H., 248 Ga. App. 570, 573(1), 547 S.E.2d 299 (2001).
The evidence outlined above, including that the mother never paid any child support, never achieved stable housing or employment, was using at least a gram of cocaine a day for five of the nine months before the termination hearing, and initiated contact with a known drug dealer and wrongfully obtained a drug prescription only six weeks before that hearing, was sufficient to *10 sustain the juvenile court's conclusion that the causes of J.E.'s deprivation were likely to continue. See In the Interest of A.R., 302 Ga.App. 702, 709-710(1)(c), 691 S.E.2d 402 (2010) ("even in the absence of an order directing [her] to pay a specific amount," a mother's failure to pay child support was "compelling evidence" that she was not an able parent and that the child's deprivation was likely to continue) (punctuation omitted); In the Interest of K.A.S., 279 Ga.App. 643, 650-651(1)(b), (c), 632 S.E.2d 433 (2006) (evidence including that mother "failed to complete two of the most important goals of her case plan, to obtain and maintain a stable, legal income and housing," was sufficient to show that the deprivation was due to lack of parental care and control and that the causes of the deprivation were likely to continue); In the Interest of M.N.R., 282 Ga.App. 46, 47-48, 637 S.E.2d 777 (2006) (even assuming that a mother had stopped using drugs by the time of the termination hearing, evidence including her admission that she had not completed a drug treatment program she enrolled in six months before the hearing and had relapsed after completing an earlier program was sufficient to affirm the juvenile court's judgment that the deprivation was likely to continue).
(d) The juvenile court was also entitled to conclude that the continued deprivation of J.E. was likely to cause serious harm to her.
OCGA § 15-11-94(b)(4)(A)(iv) demands that the juvenile court determine whether "continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child." In the Interest of A.G., 287 Ga.App. 732, 735-736, 652 S.E.2d 616 (2007). As we noted some time ago, "it is not automatically true that a finding that deprivation is likely to continue will support a finding that continued deprivation will harm the child." (Emphasis supplied.) In the Interest of J.T.W., 270 Ga.App. 26, 36-37(2)(d) 606 S.E.2d 59 (2004). As the Department points out, however, the same facts authorizing a finding that deprivation is likely to continue may also authorize a finding, under the circumstances of an individual case, that the continued deprivation is likely to cause serious harm. See In the Interest of K.A.S., supra 279 Ga.App. at 651-652(1)(d), 632 S.E.2d 433.
"[This Court] ha[s] held that evidence of a mother's repeated failure to remain drug free and her failure to take the steps necessary to reunite with [her child] was sufficient to prove that the continued deprivation would cause the child serious physical, mental, emotional, or moral harm." (Emphasis supplied.) In the Interest of M.N.R., 282 Ga.App. at 48, 637 S.E.2d 777. Citing In the Interest of K.D.E., 288 Ga.App. 520, 654 S.E.2d 651 (2007), the mother argues that even if she is unable to care for her child, that fact alone cannot justify termination when the personal relationship between mother and child has remained or become substantially positive. We are not persuaded. The mother in K.D.E. had been drug-free for over two and a half years before the termination hearing in that case, and the child had lived with his mother for five years before being placed in the Department's care, see id. at 525, 654 S.E.2d 651, whereas this mother had been drug-free for only a few months before the hearing and had never been the child's primary caregiver since custody was awarded to the Department shortly after J.E.'s birth.
Some might read our whole-court opinion In the Interest of J.K., 278 Ga.App. 564, 629 S.E.2d 529 (2006), as rejecting any inquiry into the child's present relationship with the natural parent, or as projecting the question of future harm back to the time and conditions at which the child was found deprived. See id. at 568(2), 629 S.E.2d 529 (commenting that the present state of the parent-child relationship "is not the issue" before the juvenile court, and that "[t]he only other question [besides the likely continuance of deprivation] is would the children be harmed by returning to the conditions that resulted in the original removal"). To the extent that J.K. can be read as standing for either of these propositions, it is disapproved. But even as so clarified, our law requires a juvenile court to consider not only the relationship between the parent and child at the time of the termination hearing, but also what might happen if the child were returned to the parent given the likelihood that the deprivation under which the child has been *11 suffering would continue after a reunion with that parent.
"[I]t is well settled that children need permanence of home and emotional stability[,] or they are likely to suffer serious emotional problems." In the Interest of R.J.D.B., 305 Ga.App. 888, 895, 700 S.E.2d 898 (2010). If, as we have held above, this juvenile court was authorized to determine that the deprivation was likely to continue, it was also entitled to determine that no benefits to be obtained from a continuance of the parent-child relationship, however desirable in themselves, were sufficient to protect J.E. adequately from the harmful consequences of the mother's possible or likely relapse into drug use and/or her continued failure to provide for her child. The record before us, including the mother's risk of relapsing into drug addiction, her failure to provide for J.E., and the child's need for permanence, entitled the juvenile court to draw the conclusion that clear and convincing evidence showed that J.E.'s continued deprivation was likely to cause the child serious harm. OCGA § 15-11-94(b)(4)(A)(iv); see In the Interest of R.N., supra, 224 Ga.App. at 202, 204-205, 480 S.E.2d 243 ("any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody ha[d] been lost" where a psychologist predicted that a mother's pattern of being overwhelmed by the return of her children was likely to repeat itself).
2. Given our holdings above, we are also persuaded that the juvenile court did not err when it concluded that termination of the mother's parental rights was in the best interest of J.E., considering the child's physical, mental, emotional, and moral condition and her "need for a secure and stable home." OCGA § 15-11-94(a). "The same evidence showing parental misconduct or inability may, and here does, establish this requirement." (Citation and punctuation omitted.) In the Interest of A.C., 272 Ga.App. 165, 168(2), 611 S.E.2d 766 (2005); In the Interest of M.L.P., 236 Ga.App. 504, 510(1)(d), 512 S.E.2d 652 (1999) (juvenile court has broad discretion in determining how the interest of the child is best served).
Judgment affirmed.
ELLINGTON, C.J., SMITH, P.J., MILLER, P.J., PHIPPS, P.J., MIKELL, ADAMS, DOYLE and McFADDEN, JJ., concur.
BLACKWELL, J., concurs in the judgment and in all divisions except Division 1(d).
BARNES, P.J., concurs specially and in the judgment only.
DILLARD, J., dissents.
BARNES, Presiding Judge, concurring specially and in the judgment only.
I concur fully with the majority that the evidence in this case clearly and convincingly supports the juvenile court judge's decision to terminate the parental rights of J.E.'s mother. However, I do not believe we need to reach the issue of whether to overrule or disapprove the whole-court decision in In the Interest of J.K., 278 Ga.App. 564, 629 S.E.2d 529 (2006) I therefore concur in the majority opinion, but in judgment only.
DILLARD, Judge, dissenting.
Today, we rightly disapprove our prior whole-court decision in In the Interest of J.K., in which we held that the "only logical inquiry" in evaluating whether a child's continued deprivation will cause or is likely to cause that child serious harmwithin the meaning of OCGA § 15-11-94(b)(4)(A)(iv) is whether "the child would be harmed if returned to the parent's care and control, associated environment, and state of deprivation."[1] Specifically, the majority holds that J.K. is "disapproved" to the extent that this decision can be read as "rejecting any inquiry into the child's present relationship with the natural parent, or as projecting the question of future harm back to the time and conditions at which the child was found deprived."[2] And on this very important point, I am in complete agreement with the majority. *12 Indeed, prior to our curious reasoning in J.K., it was well settled in our termination-of-parental-rights jurisprudence that the nature of the ongoing parental relationshipas it presently exists with the child in the custody of the State[3]is a highly relevant and important consideration in determining whether the child will be or is likely to be seriously harmed by a continuation of the natural parent-child relationship.[4] Thankfully, as a result of today's majority opinion, the continuing vitality of this important legal principle is no longer in doubt. For this, the majority is to be commended.
Nevertheless, I part ways with the majority in its flawed understanding of our role as an appellate court reviewing termination orders, as well as its misapprehension of the type of evidence necessary to demonstrate that a child's continued deprivation will cause or is likely to cause the child serious harm.
As to the former, the majority fails to appreciate that while we are certainly required to view the evidence in the light most favorable to the juvenile court's termination order, this in no way relieves us of our concomitant constitutional duty to assess once this deferential examination of the evidence has taken placewhether any rational trier of fact could have found by clear and convincing evidence that the statutory criteria for terminating the natural parent's rights have been proven by the State.[5] And here, I vigorously contest that the evidentiary record before us contains clear and convincing evidence that the continued deprivation will cause or is likely to cause J.E. serious harm. To the contrary, as explained infra, a holistic examination of the record before us shows that terminating the mother's rightsand thus permanently and irretrievably severing the natural parent-child relationshipwill cause seriously detrimental harm to the child.
At this point, anyone reading this opinion might be silently wondering how there can possibly be such a significant difference of opinion as to the nature of the evidentiary record before us. Such confusion is perfectly understandable, so allow me to explain what I understand to be the reason for this seemingly inexplicable gulf between our respective views of the record. In a nutshell, I believe the crux of the problem is the lens through which the majority has examined the evidentiary recordi.e., its embrace of the J.K. majority's view (albeit slightly refashioned) that the predominant consideration in evaluating the likelihood of serious harm from continued deprivation is whether the parent is presently capable of taking the child back into custody (see discussion infra).[6] And on this particular point, I could not disagree more with my colleagues.
The overarching question in a termination proceeding is not whether the child has a model parent, or even whether that parent is presently capable of taking his or her child back into custody, but is instead whether the natural parent-child relationship has been irretrievably damaged as a result of the parent's unwillingness or inability to care for the childi.e., that the continuation of the natural parent-child relationship, as it presently exists with the child in the custody of the State, is causing or is likely to cause that *13 child serious harm. As our Supreme Court has recently and rightly emphasized, "[o]ne who is subject to the termination of parental rights cannot be equated to an individual who faces an interruption of custody" because termination "is a much more severe measure" that acts as a "remedy of last resort to address the most exceptional situation of a deprived child and that child's continuing deprivation."[7] Put another way, it is one thing to remove a child from a parent's custody for reasons of neglect, but quite another to permanently and irrevocably sever the natural parent-child relationship. And there is a reason for this crucial distinction: Terminating a parent's rights, and thus forever foreclosing the possibility of restoring the natural parent-child relationship, is governmental extinguishment of the parent and child's constitutional right to familial relations.[8]
Thus, in applying the constitutionally mandated standard of review[9] and accompanying statutory criteria to termination-of-parental-rights cases, we are bound to do so bearing in mind that under both the United States and Georgia Constitutions, a parent has a fundamental constitutional right to, and liberty interest in, the care, custody, and management of his or her children,[10] and that the State may not infringe upon or sever this fiercely guarded right of familial relations except in the most compelling and extraordinary of circumstances. This is because, as we have repeatedly emphasized, "there is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship"[11] and, for this reason, "[i]t must be scrutinized deliberately and exercised most cautiously."[12] Indeed, as noted supra, regardless of *14 our charge to view the juvenile court's order in the most favorable light possible, this in no way lessens the State's burden of proffering compelling facts that demonstrate by clear and convincing evidence that the termination of a parent's constitutional right to familial relations is clearly justified;[13] nor does it obviate the requirement that a juvenile court's termination order "contain explicit findings supporting the conclusions that by reason of the deprivation the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm."[14] The propriety of a termination order, then, is inextricably intertwined with one of this republic's oldest and most sacred fundamental libertiesthe right to maintain familial relations and integrity.[15]
Unfortunately, I believe this Court has, in recent years, lost sight of the serious constitutional implications that result from a juvenile court's termination of parental rights, and the majority's decision to affirm the termination order in the case sub judice evinces this in spades.
Here, the majority provides three grounds for affirming the juvenile court's determination that J.E.'s continued deprivation, while in the custody of the State, is such that it will or is likely to cause the child serious harm: (1) "the mother's possible or likely relapse into drug use"; (2) the mother's "continued failure to provide for [the] child"; and (3) "the child's need for permanence." I will address each of these grounds in turn.
First, I have little trouble agreeing with the majority that the mother's prior drug use and ongoing struggle with cocaine dependency are grave matters, deeply troubling, and have unquestionably caused serious harm to the child in the past (hence the State's decision to take and maintain custody of the child). And were we reviewing an order denying the mother custody of the child, I would have no hesitation in finding that the mother is not presently capable of fully resuming her parental duties with respect to J.E. But that is not the question before us today. Instead, as noted supra, we are called upon to determine whether a rational trier of fact could have concluded that, at the time termination was sought by the State, there existed clear and convincing evidence that the child would be seriously harmed or was likely to be seriously harmed if the natural parent-child relationship were permitted to continue (i.e., with J.E. in foster placement and her mother having regular visitation). And from my exhaustive examination of the record, I am not aware of any evidence from which a rational trier of fact could have possibly concluded thatwhile the child remained in the custody of the Statethe mother's past drug use or ongoing struggles with cocaine dependency was causing or was likely to cause J.E. serious *15 harm, so as to justify permanently extinguishing the natural parent-child relationship.
Instead, the undisputed record evidence shows that J.E. is a healthy, well-adjusted child who is thriving in her foster-home placement and who shares a close bond with both her biological and foster mothers.[16] Additionally, J.E.'s mother hasnotwithstanding her tragic struggle with cocaine dependencyconsistently exercised her visitation with J.E. in a meaningful and productive manner,[17] and the State presented no evidence that J.E. presently suffersor, for that matter, has ever sufferedany detrimental effects as a result of this visitation schedule or noncustodial relationship with her biological mother. To the contrary, those who observed the mother's visitations with J.E. testified without contradiction that the child responds positively and enthusiastically to the time she spends with her biological mother, shows no reluctance to attend the visits, and exhibits no fear or reservations toward her biological mother. These individuals also testified, without exception, that J.E.'s mother (1) was consistently prepared for and excited about her visits with J.E., (2) actively engaged with J.E. in meaningful ways, (3) acted appropriately at all times with her daughter during their visits, (4) gave J.E. a great deal of praise and disciplined her appropriately, (5) was very cautious and aware of her surroundings when interacting with J.E., and (6) was very nurturing and loving toward her daughter when they were together. Indeed, after J.E.'s visits with her natural mother, she would say (several times): "I want to stay," "I don't want to go bye-bye," and "I love you mommy."[18] Moreover, at the time the termination petition was filed, the mother's treatment team at Women's Services was prepared to recommend that she be granted additional visitation with J.E., but the team decided not to move forward with that recommendation because the termination petition had already been filed. Finally, the mother's caseworker testified that J.E. would likely not be negatively impacted by a continuation of the status quo, and the Court-appointed special advocate indicated that denying J.E. a relationship with her biological mother would be "detrimental" to the child.
Thus, while I am perfectly willing to concede that the parade of horribles outlined by the majority in describing the mother's background is deeply troubling, I, nevertheless, remain resolute in my view that the United States and Georgia Constitutions do not permit us to permanently and irrevocably extinguish the natural parent-child relationship without clear and convincing evidence that parental misconduct or inability is causing or is likely to cause the child serious harm. And here, I can only discern two possible reasons for the utter dearth of evidence that the mother's struggles with drug dependency have negatively impacted her relationship with J.E. in any appreciable manner while the child has been in the custody of the State: (1) the mother has made extraordinary efforts to maintain and strengthen her relationship with J.E., and in the process of doing so shielded the child from any signs of her cocaine dependency during their visits; or (2) the State simply failed to offer any evidentiary basis, beyond mere conjecture, for its assertion that the mother's struggles with drug dependency (and possible relapse) were likely to cause the child (while in foster placement) serious harm. Suffice it to say, neither explanation supports the majority's decision to affirm the juvenile court's termination order.
Additionally, I am likewise unwilling to conclude that a child will be or is likely to be *16 seriously harmed by the continued deprivationwhile that child is in the custody of the Statesimply because the parent in question is poor and presently unable to financially provide for the child.[19] Thus, while economic considerations unquestionably come into play in making protective-custody determinations, I fail to see how a parent's present financial inability to care for his or her child canin the absence of any showing of harm to the child while in the custody of the Statebe used as an independent or predominant basis for terminating the natural parent-child relationship. Indeed, we have said as much in our prior decisions by holding that a parent's mere "inability to care for her children does not necessarily mean that her current relationship with them is detrimental."[20] We have also held that the State is not permitted to "terminate a parent's natural right because it has determined that the child might have better financial, educational, or even moral advantages elsewhere[,]"[21] but may only do so "under compelling circumstances found to exist by clear and convincing proof[.]"[22] I strongly agree with both of the foregoing lines of this Court's termination-of-parental-rights jurisprudence because, in my view, using a parent's poverty as a means of justifying the termination of the natural parent-child relationship is patently unconstitutional in the absence of clear and convincing evidence that the parent's dire financial circumstances are the result of parental misconduct or inability that is causing or is likely to cause the child serious harm (even while the child is in the custody of the State).
Finally, I am likewise unpersuaded by the majority's reliance on generalized notions of permanency as a basis for terminating parental rights. While I do not quibble with the general proposition that children need permanency (or, for that matter, the corollary that long-term foster care can have ill effects), I find it troubling that many of our prior decisions upholding the termination of parental rights appear to rely, in part, on such generalizations without specifically tying them to particularized findings of fact,[23] even though we have repeatedly held that a juvenile court is required to make explicit findings of fact that the child at issue rather than some hypothetical child placed in the subject child's situationwill suffer or is likely to suffer serious harm as a result of the continued deprivation.[24] As we have previously noted, "[e]ach child in these circumstances deserves [and requires] a full, separate, and thoughtful review by the juvenile court of the issues relating to [her],"[25] and this cannot and will not happen if the child is treated as if she were merely part of some *17 detached hypothetical inquiryrather than as what she actually is, a human being with inherent dignity and worth.[26]
As the Supreme Court of the United States so eloquently explained in the seminal decision of Santosky v. Kramer, the "fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State,"[27] and "[w]hen the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures."[28] This is because, according to the Santosky Court, "[e]ven when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life[,]" and "persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs."[29] In so holding, the Santosky Court reasoned as follows:
In parental rights termination proceedings, the private interest affected is commanding; the risk of error from using a preponderance standard is substantial; and the countervailing governmental interest favoring the standard is comparatively slight.... [A] natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right. When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it. If the State prevails, it will have worked a unique kind of deprivation. ... A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one.... Once affirmed on appeal, a ... decision terminating parental rights is final and irrevocable. Few forms of state action are so severe and so irreversible.[30]
And while the Supreme Court's holding in Santosky is unquestionably about procedural fairness, there is also a strong substantive component to this decision.[31] Indeed, by imposing *18 a clear-and-convincing standard of proof on the States in termination-of-parental-rights proceedings, the Santosky Court spoke volumes about the level of protection it understands the United States Constitution to afford parental rights in this dire context.[32]
Regrettably, I believe the majority's decision today, as well as the current state of this Court's termination-of-parental-rights jurisprudence, is wholly inconsistent with the Supreme Court's reasoning and holding in Santosky and fails to offer meaningful protection to the parental rights of this State's socioeconomically disadvantaged citizens.[33] Indeed, contra the majority's reasoning, the reasoning in Santosky strongly suggests that the nature of the ongoing parent-child relationship is of the utmost importance in determining whether that relationship should be permanently dissolved by the State.[34] And by treating the juvenile court's inquiry into the nature of the ongoing parent-child relationship as if it were merely one of many factors to consider, the majority (1) fails to acknowledge, in any meaningful sense, the ongoing, vital constitutional interest held by both the parent and child in preserving their natural relationship, notwithstanding its present noncustodial nature;[35] and (2) exponentially increases the likelihood of parental rights being arbitrarily terminated in cases in which there continues to be a strong emotional bond between the parent and his or her child.
Needless to say, I am deeply troubled by this Court's failure to provide meaningful appellate review in this case, or to safeguard the mother's constitutional right to familial relations with her daughter against what I consider to be an erroneous termination of their natural parent-child relationship. My sincere hope is that this Court will, in future cases, revisit the degree of emphasis a juvenile court is constitutionally required to place on the ongoing nature of the parent-child relationship when considering whether the continued deprivation will cause or is likely to cause serious harm to the child.
In the final analysis, I believe that any determination that the continued deprivation will or is likely to "cause serious physical, mental, emotional, or moral harm to [a] *19 child"[36] must necessarily include a finding of serious harm or a likelihood of serious harm in maintaining the "uneasy status quo,"[37] and because I find no such harm in the case sub judice, I respectfully dissent.[38]
NOTES
[1] 278 Ga.App. 564, 567(1), 629 S.E.2d 529 (2006) (emphasis in original).
[2] Supra, Majority Opinion at ___.
[3] See In the Interest of D.L.T.C., 299 Ga.App. 765, 770(1), 684 S.E.2d 29 (2009) (holding that a "finding of parental unfitness must be based on present circumstances" (punctuation and footnote omitted)); OCGA § 15-11-94(a).
[4] See, e.g., In the Interest of K.D.E., 288 Ga.App. 520, 526, 654 S.E.2d 651 (2007); In the Interest of A.T., 271 Ga.App. 470, 474, 610 S.E.2d 121 (2005); In the Interest of J.S.B., 277 Ga.App. 660, 663(2)(d), 627 S.E.2d 402 (2006); In the Interest of J.T.W., 270 Ga.App. 26, 36-37(2)(d), 606 S.E.2d 59 (2004); In the Interest of J.H., 267 Ga.App. 541, 545, 600 S.E.2d 650 (2004); In the Interest of J.H., 258 Ga.App. 211, 216, 573 S.E.2d 481 (2002); In the Interest of B.F., 257 Ga.App. 76, 78, 570 S.E.2d 385 (2002) (physical precedent only); In the Interest of B.F., 253 Ga.App. 887, 891, 560 S.E.2d 738 (2002); In the Interest of D.F., 251 Ga.App. 859, 862, 555 S.E.2d 225 (2001); In the Interest of J.M., 251 Ga.App. 380, 383(4), 554 S.E.2d 533 (2001); In the Interest of K.J., 226 Ga.App. 303, 308(2)(b), 486 S.E.2d 899 (1997); In the Interest of C.T., 185 Ga.App. 561, 564-65, 365 S.E.2d 117 (1987).
[5] See, e.g., In the Interest of A.G., 287 Ga.App. 732, 732, 652 S.E.2d 616 (2007).
[6] See In the Interest of J.K., 278 Ga.App. at 568(2), 629 S.E.2d 529 ("The question is whether, if the children were returned to the mother's care, would they likely suffer serious harm as a result thereof?").
[7] In the Interest of A.C., 285 Ga. 829, 833(2), 686 S.E.2d 635 (2009) (citations omitted; emphasis supplied).
[8] Unlike a custody proceeding, the termination of a natural parent's rights "leaves the parent with no right to visit or communicate with the child, to participate in, or even to know about, any important decision affecting the child's religious, educational, emotional, or physical development." Lassiter v. Dep't of Soc. Servs. of Durham County, N.C., 452 U.S. 18, 39(I)(A), 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (Blackmun, J., dissenting); see also Santosky v. Kramer, 455 U.S. 745, 759(III)(A), 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("When the State initiates a parental rights termination proceeding, it seeks not merely to infringe [a] fundamental liberty interest, but to end it."); id. at 760-61, 102 S.Ct. 1388 ("At the factfinding, the State cannot presume that a child and his parents are adversaries.... [U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." (footnote omitted)).
[9] See Santosky, 455 U.S. at 769-70(IV), 102 S.Ct. 1388.
[10] See, e.g., Troxel v. Granville, 530 U.S. 57, 65-67(II), 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); M.L.B. v. S.L.J., 519 U.S. 102, 116-19(IV), 117 S.Ct. 555, 136 L.Ed.2d 473 (1996); Santosky, 455 U.S. at 747-48, 102 S.Ct. 1388; Lassiter, 452 U.S. at 27-28(II)(B), 101 S.Ct. 2153; id. at 38-40(I)(A), 101 S.Ct. 2153 (Blackman, J., dissenting); Parham v. J.R., 442 U.S. 584, 602(III)(b), 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); Quilloin v. Walcott, 434 U.S. 246, 255(II)(A), 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); Smith v. Org. of Foster Families for Equality & Reform, 431 U.S. 816, 845(II)(B), 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977); Moore v. City of East Cleveland, Ohio, 431 U.S. 494, 503-06(III), 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion); Wisconsin v. Yoder, 406 U.S. 205, 235(V), 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Stanley v. Illinois, 405 U.S. 645, 651-52(II), 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Ginsberg v. New York, 390 U.S. 629, 637-39(I), 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); May v. Anderson, 345 U.S. 528, 533, 73 S.Ct. 840, 97 L.Ed. 1221 (1953); Prince v. Massachusetts, 321 U.S. 158, 165-66, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510, 534-36, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 398-403, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Clark v. Wade, 273 Ga. 587, 593-94(III), 600-01(V), 544 S.E.2d 99 (2001); id. at 606-08, 544 S.E.2d 99 (Thompson, J., dissenting); Brooks v. Parkerson, 265 Ga. 189, 191-92(2)(a), 454 S.E.2d 769 (1995); In re Suggs, 249 Ga. 365, 367(2), 291 S.E.2d 233 (1982); Kirkland v. Lee, 160 Ga.App. 446, 455-56(I), (II), 287 S.E.2d 365 (1981) (Deen, J., dissenting); see also Doe v. Heck, 327 F.3d 492, 517-20(II)(B) (7th Cir.2003) (Manion, J.); U.S. Const. amends. IX & XIV; Ga. Const. Art. I, § I, ¶ XXIX.
[11] In the Interest of L.J.L., 247 Ga.App. 477, 479, 543 S.E.2d 818 (2001) (punctuation and footnote omitted); see also Thaggard v. Willard, 285 Ga. App. 384, 389, 646 S.E.2d 479 (2007) (same); In the Interest of R.C.M., 284 Ga.App. 791, 800(III)(3), 645 S.E.2d 363 (2007) (same).
[12] In the Interest of K.J., 226 Ga.App. at 306(1), 486 S.E.2d 899 (citation and punctuation omitted); see also Nix v. Dep't of Human Res., 236 Ga. 794, 795, 225 S.E.2d 306 (1976) ("There can scarcely be imagined a more fundamental and fiercely guarded right than the right of a natural parent to its offspring."); Sanchez v. Walker County Dep't of Family, etc., 237 Ga. 406, 411, 229 S.E.2d 66 (1976) ("[W]resting a child away from the care and custody of its parents is of serious consequence [and] is so drastic that it should be attended only by the most stringent procedural safeguards."); In the Interest of D.W., 300 Ga.App. 438, 441(1), 685 S.E.2d 311 (2009) ("Termination of parental rights is a remedy of last resort[.]").
[13] See Blackburn v. Blackburn, 249 Ga. 689, 692(2), 292 S.E.2d 821 (1982) (acknowledging that "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the United States Constitution," and that "the Due Process Clause of the Fourteenth Amendment demands that before a state may sever the rights of parents in their natural child, the state must support its allegations by at least clear and convincing evidence" (punctuation and emphasis omitted) (citing Santosky)).
[14] In the Interest of K.J., 226 Ga.App. at 307(2)(b), 486 S.E.2d 899 (citation and punctuation omitted); see also id. (holding that "[a] dry recitation that certain legal requirements have been met is insufficient to satisfy the requirements of the law," and that "[t]he trial judge is to ascertain the facts and to state not only the end result of that inquiry but the process by which it was reached" (citation and punctuation omitted)); In the Interest of J.T.W., 270 Ga.App. at 37(2)(d), 606 S.E.2d 59 ("[I]t is not automatically true that a finding that deprivation is likely to continue will support a finding that continued deprivation will harm the child.").
[15] See Moore, 431 U.S. at 503-04(III), 97 S.Ct. 1932 (plurality opinion) ("[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition.").
[16] As an aside, I feel compelled to express my sincere admiration of J.E.'s foster mother, as well as all foster parents, who provide the children entrusted to them by the State with loving and nourishing homes, in which these children of neglect can thrive and reach their full potential.
[17] See In the Interest of D.L.T.C., 299 Ga.App. at 765, 684 S.E.2d 29 (noting as a positive in reversing the juvenile court's termination order that the biological parents were "consistently involved in the process since [their] children were removed from their custody....").
[18] J.E.'s mother even expressed an interest in developing a relationship with the foster mother for the sake of the child.
[19] See In the Interest of M.S.S., 308 Ga.App. 614, 626, 708 S.E.2d 570 (2011) (Dillard, J., concurring specially) (rejecting "the majority's assertion that a natural parent's rights can be terminated merely because the mother failed to satisfy certain elements of the State's reunification plan (e.g., securing stable employment and housing), or because she was not financially or emotionally capable of parenting her child at the time of the termination hearing").
[20] In the Interest of J.S.B., 277 Ga.App. at 663(2)(d), 627 S.E.2d 402 (citation and punctuation omitted; emphasis supplied); see also In the Interest of J.D., 280 Ga.App. 861, 865(1)(c), (d), 635 S.E.2d 226 (2006) (holding that evidence of continued deprivation "does not automatically support" a finding that the continued deprivation is likely to cause the child serious harm; "instead, there must be evidence in the record that goes beyond showing simply an inability to parent one's children"); In the Interest of A.T., 271 Ga.App. at 473, 610 S.E.2d 121 (same); In the Interest of J.T.W., 270 Ga.App. at 36(2)(d), 606 S.E.2d 59 (same); In the Interest of J.H., 258 Ga.App. at 216, 573 S.E.2d 481 (same); In the Interest of B.F., 257 Ga.App. at 79, 570 S.E.2d 385 (physical precedent only) (same); In the Interest of B.F., 253 Ga.App. at 891, 560 S.E.2d 738 (same); In the Interest of J.M., 251 Ga.App. at 383(4), 554 S.E.2d 533 (same); In the Interest of D.F., 251 Ga.App. at 862, 555 S.E.2d 225 (same); In the Interest of K.J., 226 Ga.App. at 308(2)(b), 486 S.E.2d 899 (same); In the Interest of C.T., 185 Ga.App. at 563, 365 S.E.2d 117 (same).
[21] Blackburn, 249 Ga. at 694(2), 292 S.E.2d 821 (citation and punctuation omitted).
[22] Id. (citation and punctuation omitted).
[23] See, e.g., In the Interest of R.J., 308 Ga.App. 702, 708 S.E.2d 626 (2011); In the Interest of D.B., 306 Ga.App. 129, 139(2), 701 S.E.2d 588 (2010); In the Interest of A.R., 302 Ga.App. 702, 711(1)(d), 691 S.E.2d 402 (2010).
[24] See, e.g., In the Interest of K.J., 226 Ga.App. at 307(2)(b), 486 S.E.2d 899.
[25] In the Interest of A.B., 263 Ga.App. 697, 701(2), 589 S.E.2d 264 (2003).
[26] See, e.g., In the Interest of J.S.B., 277 Ga.App. at 663(2)(d), 627 S.E.2d 402 (reversing termination order because there was "insufficient evidence to support the juvenile court's conclusion that continued deprivation is likely to cause serious harm to the children[,]" and in so holding, noting that "[u]nlike other cases where we have found evidence of such harm, here no expert witness ... testified that ... impermanency or instability were causing specific harms to the children[,]" and "the only attempt to show that continued deprivation might possibly cause the children harm came from the vague testimony... that the mother's past history of arrests, mental health issues, and inability to maintain employment created an unsafe and unstable environment"); compare In the Interest of A.T., 271 Ga.App. at 473, 610 S.E.2d 121 (giving concrete examples of evidence where the continued deprivation is likely to cause the child serious harm: (1) a caseworker testifying "as to any adverse effect on the children by their remaining in foster care as opposed to their being permanently adopted," (2) "testimony from an expert witness such as a psychologist that permanency and a stable environment were important to these children's well-being[,]" (3) "that the failure to terminate the mother's parental rights would be detrimental to the children (by causing such things as anger problems, school problems, or academic struggles)[,]" (4) "testimony of children as to their anger at being in foster care and as to their need for a permanent home[,]" or (5) "testimony of witnesses that visits or contact with the parent adversely affected the children" (citations omitted; emphasis supplied)).
[27] 455 U.S. at 753(II), 102 S.Ct. 1388 (emphasis supplied).
[28] Id. at 753-54(II), 102 S.Ct. 1388.
[29] Id. at 753(II), 102 S.Ct. 1388 (emphasis supplied).
[30] Id. at 758-59(III)(A), 102 S.Ct. 1388 (citations and punctuation omitted; emphasis supplied).
[31] In acknowledging that parents have a fundamental constitutional right to familial relations with their natural-born children, the Supreme Court of the United States has primarily grounded this substantive right in the Due Process Clause of the Fourteenth Amendment. See, e.g., Meyer, 262 U.S. at 399, 43 S.Ct. 625; Stanley, 405 U.S. at 651(II), 92 S.Ct. 1208. Other courts have identified the Ninth Amendment or other provisions of the Fourteenth Amendment as providing independent or arguably more appropriate constitutional bases for this fundamental right. See, e.g., Doe, 327 F.3d at 517-18 (B) & n. 22. But regardless of the constitutional mooring for the right to familial relations, there is no doubt that this right was widely recognized and accepted by the men who wrote and ratified our federal Constitution. See id.; 2 St. George Tucker, Blackstone's Commentaries with Notes of Reference to the Constitution and Laws of the Federal Government of the United States and the Commonwealth of Virginia 446 (Birch & Small 1803) ("The duty of parents to provide for the maintenance of their children, is a principle of natural law."); 2 James Kent, Commentaries on American Law 169 (O. Halsted 1827) (noting that "[t]he rights of parents result for their duties [to their children]," and "the law has given them such authority"); John Locke, Second Treatise of Government, Ch. 6, § 71 (Hackett Publishing Co., Inc. 1980, originally published in 1690) ("This shews the reason how it comes to pass, that parents in societies, where they themselves are subjects, retain a power over their children, and have as much right to their subjection, as those who are in the state of nature.").
[32] See Santosky, 455 U.S. at 772-73(I), 102 S.Ct. 1388 (Rehnquist, J., dissenting) ("The majority may believe that it is adopting a relatively unobtrusive means of ensuring that termination proceedings provide `due process of law[,' but] .. . [in] holding that due process requires proof by clear and convincing evidence the majority surely cannot mean that any state scheme passes constitutional muster so long as it applies that standard of proof. A state law permitting termination of parental rights upon a showing of neglect by clear and convincing evidence certainly would not be acceptable to the majority if it provided no procedures other than one 30-minute hearing. Similarly, the majority probably would balk at a state scheme that permitted termination of parental rights on a clear and convincing showing merely that such action would be in the best interests of the child.").
[33] Id. at 763(III)(B), 102 S.Ct. 1388 ("Because parents subject to termination proceedings are often poor, uneducated, or members of minority groups, such proceedings are often vulnerable to judgments based on cultural or class bias." (citation omitted)).
[34] See also Thorne v. Padgett, 259 Ga. 650, 651, 386 S.E.2d 155 (1989) (emphasizing that parental rights may only be terminated in "compelling circumstances," and that "even an unwed father who demonstrates a commitment to parenthood by participating in the life of his child `acquires substantial protection under the Due Process Clause' of his parental rights," in striking down as unconstitutional a statute that failed to "distinguish between those cases where the failure to provide support is wilful, and those cases where the parent wishes to provide care and support for his child, but lacks the financial resources or ability to do so" (emphasis supplied)).
[35] See Santosky, 455 U.S. at 748(I)(A), 102 S.Ct. 1388.
[36] In the Interest of A.G., 287 Ga.App. at 735-36, 652 S.E.2d 616 (citation and punctuation omitted; emphasis supplied); see also OCGA § 15-11-94(b)(4)(A).
[37] See Santosky, 455 U.S. at 765-66(III)(B), 102 S.Ct. 1388 (noting that "[f]or the child, the likely consequence of an erroneous failure to terminate is preservation of an uneasy status quo[,]" whereas "[f]or the natural parents, ... the consequence of an erroneous termination is the unnecessary destruction of their natural family"); In the Interest of K.D.E., 288 Ga.App. at 526(1), 654 S.E.2d 651 (reversing termination order, and in doing so noting that "even if there were sufficient evidence before us to support a finding of continued deprivation, termination of the parental rights of the mother would not be warranted here because there is no evidence in the record that any continued deprivation is likely to cause physical, mental, emotional, or moral harm to the child," and that while "a caseworker gave general testimony in response to leading questions that the Department was concerned about the detrimental effects of foster care on the child, there was no evidence that [the child] was experiencing difficulties, such as behavioral or social issues, from being in foster care or that he would experience difficulties if a permanent placement was not put into place; and there was no testimony that a continued relationship with his mother would result in any potential or actual harm to the child"); In the Interest of T.P., 270 Ga.App. 700, 706(4), 608 S.E.2d 43 (2004) (reversing termination order, notwithstanding finding of continued deprivation, because "there was no testimony from any professional, or from any lay witness, that the child would [likely] suffer [serious] harm from the current situation[,]" and specifically "there is no indication that continued exposure to the mother will cause the child harm"); see also In the Interest of J.K., 278 Ga.App. at 572-73, 629 S.E.2d 529 (Ruffin, J., concurring specially) (noting a line of this Court's jurisprudence holding that a "finding of continuing deprivation is not enough to demonstrate that deprivation is harmful to the child," and noting that "these cases require affirmative evidence that the child will be seriously harmed by an ongoing parental relationship").
[38] While I conclude that the juvenile court erred in terminating the mother's parental rights, I, nevertheless, do not fault the juvenile court for reaching this conclusion given the current (and virtually incomprehensible) state of this Court's termination-of-parental-rights jurisprudence. I have nothing but the greatest respect for the tremendous work and efforts our juvenile-court judges put into each and every case.