A07A1990. IN THE INTEREST OF C. G. et al., children.
(658 SE2d 448)

ADAMS, Judge.

The parents of four children appeal the termination of their parental rights. They contend the evidence was insufficient to support the decision. On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. *In the Interest of S. H.*, 251 Ga. App. 555 (1) (553 SE2d 849) (2001). "We do not weigh the evidence and must defer to the trial judge as the factfinder." (Citation and punctuation omitted.) *In the Interest of C. F.*, 251 Ga. App. 708 (555 SE2d 81) (2001).

C. G. and Y. W. are the unwed mother and biological father of the four children at issue, who were age five, three, two, and two months, respectively, as of May 2004. At that time, the parents had limited income. The mother was unemployed and on food stamps, but she

---

received a disability check every month for $565 because she has a learning disability and cannot work. The father was making about $200 a week in a part-time job, but he had no transportation and had to walk to work. The parents apparently were unable to manage these resources. They were forced to move to temporary accommodations that were too small for the family, and they did not have enough money for food and diapers for the children. On May 18, 2004, the Department of Family and Children Services (DFACS) removed the children from the parents when it learned of these conditions. The initial caseworker did not testify, and there is no other information in the record about the conditions in which the children were living with their parents.

On May 28, 2004, following the original detention hearing, the Juvenile Court of Cobb County found as a matter of fact that probable cause existed to believe the children were deprived because "[t]he parent's financial circumstances are insufficient to the point of not being able to provide for the children's basic necessities of life." The judge also found that continuation in the home would be contrary to the children's welfare because "[n]o parent is able to provide appropriate care, control or custody of the children." On June 10, 2004, following a final deprivation hearing, the court made the same findings based on "clear and convincing evidence." The children were placed in the custody of DFACS, and the parents consented to case plans for the children.

In the next several months, the parents made some progress but not enough to satisfy the court. On July 14, 2004, following a review hearing, the court ordered that temporary legal custody continue with DFACS for the reason that "[e]vidence having been provided that the parents have improved their circumstances, however they are not yet ready to assume[ ] custody of their children." On September 4, 2004, the judicial citizen panel found that the parents were "very inconsistent" in their visitation. The panel recommended concurrent case plans for reunification and adoption. At a review hearing scheduled for September 8, 2004, the same judge continued the matter for two months to allow the parents additional time to secure employment and stable housing. In January 2005, following the December citizen panel review, the court ordered continued placement of the children because the "Mother and Father have not completed [the] case plan," and ordered that the concurrent plans be put in place. As of January 12, the parents were still residing in an extended stay lodge, they were receiving parenting classes there, and the father was employed.

From December 2004 through February 2005, DFACS provided support services to the parents through Ms. Halliburton of "Family

Ties." She provided approximately 12 sessions of a parenting curriculum to the parents, during which the parents were "very cooperative" and receptive; and the mother's responses during the training were appropriate. The parents completed the curriculum. Halliburton testified that the parents maintained an appropriate, presentable and clean home with ample food. The one time Halliburton saw the mother interact with the children, she acted appropriately.

On two occasions, Halliburton also helped the couple try to find affordable housing in a suitable area. Halliburton identified one place and offered to take the parents there; but the couple did not proceed because their ride did not show up and they did not notify Halliburton, who could have helped. The mother testified that she and the father could not get to the second potential residence because they did not have transportation and she could not ride the bus because she was pregnant and had morning sickness at the time. She acknowledged, however, that she did not ask for help with housing after her pregnancy.

Halliburton provided some limited assistance and transportation to the mother to help her find a job. With Halliburton's help, the mother applied at fast food restaurants but was unsuccessful in three attempts. The mother, however, testified that the last time she had a similar job, her disability check was reduced. The father had two jobs at the time. Halliburton eventually closed her case file because she had done "what I needed to do in relationship to that case"; she testified that she could not provide additional services because the parents did not have suitable housing.

Meanwhile, on January 7, 2005, licensed psychologist Jeffrey J. Pipe issued a psychological evaluation of the parents. Pipe found, among other things, that the mother's IQ was between 58 and 66; that she lacked insight into relevant childcare issues; that she was unable to determine an appropriate response to common childcare situations; and that she showed little awareness of a child's personal, emotional or psychological experience. Pipe found that the father's IQ was between 75 and 83; that he is domineering, over-controlling, mistrusting of others, and intolerant of those who disagree with him; and finally, that he has an inflated self-image that affects his ability to hold a job.

A panel review held on March 17, 2005 found the children did not have any adverse reaction after visits with the parents. However, the parents had visited "inconsistently" and were making "little or no progress" on the case plan.

A review hearing was held in court on April 6, 2005. In the corresponding order, the court found that the parents had stipulated that the children continued to be deprived because they were unable to provide for the children. She found that the permanency plan

provided for termination of the parental rights. She ordered that temporary custody remain with Cobb County DFACS. Later in April, the court ordered that the children should continue in their current placement because the parents "do not have stable housing or income."

On August 16, 2005, DFACS filed a petition for each child to terminate the parents' parental rights. Each petition stated the following grounds:

The department shows the child is deprived and parental rights should be terminated based in part on the parents inability to provide daily necessities of life for the child, maintain stable employment and housing, and adequately address the mother's mental health issues.

In the corresponding petition, DFACS alleged the following specific circumstances: that the parents were unable to provide basic necessities for the children and had essentially abandoned their parental responsibilities; that they had "failed to communicate or make a bona fide attempt to communicate with the children in a meaningful, supportive, parental manner"; that they had neglected the children, failed to provide care and support, failed to comply with court ordered plans, and failed to develop and maintain a parental bond; and finally, that the mother "has a medically verifiable deficiency of her physical, mental, or emotional health of such duration as to render the mother unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the children. . . ." The father was also given notice that he needed to file a petition to legitimate the children.

As of September 22, 2005, the case plan indicated that the parents had achieved most case plan goals or that progress was "ongoing." Although the citizen review panel found that visitation was still inconsistent, it noted that the parents had just provided papers indicating they had obtained housing and employment. The panel also reported that the children were doing well in foster care. But in November 2005, following a citizen panel review, the juvenile court ordered that the children should continue in their current placement and that a guardian ad litem should be appointed to determine whether termination proceedings should be commenced because the parents "have not completed case plan."

In October, the parents obtained a three-bedroom house for $750 per month, and the house was approved by DFACS for the children. But DFACS had to tell the mother that she needed food and beds. And despite the fact that donated furniture was available, the father rented furniture, thereby using some of their limited resources. On November 18, 2005, the father petitioned to legitimate the children.

That same day, the then-scheduled termination hearing was continued to February 10, 2006, "[s]o [that the] parents may continue to work on [the] case plan. Progress has been reported on important items of case plan, i.e., housing and employment." The court also entered another continuance, this time noting that the petition to terminate parental rights had been withdrawn and dismissed without prejudice. And the case plan was changed to reunification because "[p]arents [are] making good progress at this time. Legitimation to be presented as consent at review hearing."

Shortly thereafter, Dr. Ernest Frimpong, a licensed social worker with a doctorate in divinity, began to provide therapeutic family counseling services to the parents on behalf of DFACS. The counseling ran from February through May 2006, with a goal of helping the parents maintain emotional stability in order to prepare them for possible reunification with the children. Frimpong initially met with the family on a weekly basis and later, twice monthly; they met a total of ten to twenty times, although there were times the family was not available.

Frimpong testified that the father was receptive to counseling but had some difficulty keeping scheduled appointments. He detected some "poverty of thought and poor judgment" in the parents regarding their understanding of what they needed to do in order to get the children back. He opined that this could "seriously impact on the care of the children." For example, they rented expensive furniture even though they did not have the means. Frimpong offered to donate furniture to the family, but the father failed to pick it up and continued to rent instead. Later, when the rental company removed the furniture for failure to pay, the mother and father cancelled a visitation with the children because they had no furniture. At one visitation, Frimpong observed one of the children pull away from his father and two children somewhat reject attempts by the mother and father to hold or interact with them. But he clarified that the children liked to visit their parents; they were simply becoming more attached to their foster parents with whom they had "warm" relationships. He believed that the parents were making progress with the counseling and "really trying," but they missed some appointments. Yet he also testified that the parents were reluctant to accept help. He thought that if the family's financial situation improved and their communication abilities improved, thereby allowing for proper housing and stable finances, they could possibly improve their ability to parent the children. Regarding the mother, he opined that if the parents had jobs and housing, and if they improved their communication and became emotionally stabilized, they could be adequate parents for the children.

As of March 16, 2006, the citizen review panel still recommended reunification. But in May, DFACS recommended termination again. DFACS had contacted the father to request documentation of his income, rental and utility payments so that it could be assured that the family's financial situation was secure before returning the children. The father failed to produce the information, and DFACS was forced to contact the landlord directly. The landlord explained that the parents were three months behind on the rent and had failed to follow through with either of two proposed plans for making up the debt. The parents were evicted in April 2006, six months after they moved in. Eventually, Dr. Frimpong was unable to make contact with the parents due to their housing issues, and he ceased providing counseling.

In April 2006, DFACS refiled the petition for deprivation raising the same allegations as before. A hearing was scheduled for June 2, 2006. On May 8, the court appointed a guardian ad litem for the children and attorneys for the parents.

As of the time of the final termination hearing in June, the children were ages seven, five, four, and two, respectively. The parents were again living in temporary accommodations that were not large enough for the entire family. The mother was unemployed and, when asked what she did all day, she replied, "Watch tv, clean up," and try to find a job. But she admitted that she had not tried to get a job in 2006 nor asked for any additional help from DFACS in this regard. The father admitted he still could not feed his family. The father testified that he had just landed a full-time position at Waste Management through a temporary labor company, earning $8 per hour. But the couple did not have any transportation, and it was unclear how the father would get to work. The caseworker had to bring them to the termination hearing. The father had been renting a car since August 2005, but it had just been impounded because there was no registration or insurance on the vehicle. He had little explanation for his failure to pull the family financial situation together over two years after the initial intervention by DFACS.

As of the date of the hearing, the parents had never paid any child support and had begun to visit the children less frequently. From May 2004 to the beginning of 2006, they had visited the children about two times a month. But in 2006, the visitations dropped off: the mother visited only once between February and June and blamed a lack of transportation; and the father recalled two or maybe four times when he saw the children during that time. The mother testified that the children were excited to see her during visits and that she missed them. The parents claimed to have brought some money, food and clothes to the children on several occasions, as well as Christmas gifts. But the mother did not know and had not asked where her two

older children went to school. And she does not know what daycare would cost if she were to get the children back. She testified that she intended to have more children in 20 years, but she did not know how old she would be then. The father essentially conceded that when DFACS brought services or the children directly to them, the parents benefitted; but when the parents were required to go elsewhere, they typically did not go.

At the hearing, Dr. Pipe testified about his earlier psychological assessment of the parents. Pipe concluded, "There [are] no psychological reasons why [the father] wouldn't be able to provide appropriate care for his children" as long as he receives counseling on his tendency to view himself uncritically — perhaps eight to twelve sessions — and on issues that might block him from finding stable employment. But the father never received this type of counseling.[1] With regard to the mother, Pipe did not believe that she would ever get past the intellectual limits that she had that impacted on her ability to parent. For that reason, Pipe had a great deal of concern for her ability to parent four children, although he did not see any risk that she would harm a child intentionally and believed she could succeed in co-parenting if she were provided constant help and guidance.

One foster parent testified that the youngest child had negative physical reactions to visiting her mother, including diarrhea and vomiting, but her reaction had subsided over time. She testified that the child will go to her father but draws back from her mother. She also testified that she gave the parents her phone number but they have never called to talk to the child, and that they did not act on an offer to visit the child at her home. This foster parent hoped to adopt the child.

Rachel Bailey, the caseworker for the children from August 2004 forward, testified that another of the foster parents was interested in adopting the other girl. She testified that the only foster parents the two boys have had are not interested in adopting but that their own grown son and his wife had expressed an interest. She had not been able to locate any suitable relatives for placement of the children. She testified that DFACS never provided the individual therapy recommended for the father by Dr. Pipe because DFACS's main focus with the parents was stable housing and stable employment. In fact, the

---

[1] DFACS did not provide the individual therapy to the father that had been recommended by Dr. Pipe, nor did the court order it. DFACS never gave Frimpong a copy of Dr. Pipe's report or modify the case plan to include the services recommended by Dr. Pipe.

goals of the parents' case plan have never changed. Ultimately, Bailey felt like the family was right back where it was when DFACS first became involved.

The guardian ad litem testified that there was no evidence that the children were abused, malnourished, not healthy, or not taken care of; that the father needs the recommended counseling and that DFACS failed to provide it; that she did not see any long-term damage resulting from the children being in the foster care where they had been placed; that with regard to the mother, the government considers her disabled enough to provide her income in lieu of a job; that the family was managing for five years with children prior to DFACS's involvement; and that it was not in the best interests of the children to terminate the parental rights at the time. She recommended the case proceed toward reunification with the father obtaining the recommended counseling.

Following the June termination hearing the court terminated the mother's and father's parental rights. In the order, the court listed examples of the parental misconduct and/or inability of the mother and father to properly provide for the children, including that the parents did not have the ability to provide for the basic necessities of life for the children and had essentially abandoned their parental obligations; that after DFACS dismissed its prior petition for termination, the parents failed to show significant compliance with the reunification goals; that the mother had a history of unstable employment and had not sought employment in 2006 even though it was part of the case plan; that the parents were evicted from the only home other than a hotel room that they have had since the children were first removed; that the parents had failed to make regular visitation with the children since February 2006; that the mother had completed parenting classes and intended to obtain a job but had no transportation or plan; that the father has had only sporadic employment although he had recently been hired by Waste Management; that housing in a hotel is inadequate for the children; that the father has no transportation; that the father has no car and agrees that if the children were returned, he could not feed them.

The court further found that the parents failed to take advantage of the assistance offered by Halliburton; that the father had borderline intelligence as well as personality traits, including poor decision making, that might explain the father's failure to obtain full-time employment and appropriate housing; that the mother had a degree of mental retardation that resulted in a restricted ability to be an effective parent to a degree that "might subject the children to potential harm"; that one child would cling to the foster parents and not go willingly to the parents; that the youngest child, now age two,

had developed strong bonds with the foster mother who was interested in adopting the child; that the same child had an adverse reaction to spending time with the parents; that the foster parent of another child has interest in adopting but that the foster parents for the other two children do not; that no family members have come forward with a genuine interest in permanently providing for the children.

Finally, the court cited the following examples of how continued deprivation will or is likely to cause serious harm to the children:

> The parent[s'] lack of contact and regular visitation with the children shows a serious lack of interest in the development and welfare of the children which creates a strong presumption that they will continue to neglect the children in the future. The parent[s'] failure to contribute to the financial support of their children shows a careless disinterest in whether their children are provided daily necessities.

The court concluded that it found clear and convincing evidence of parental misconduct or inability and that termination was in the best interests of the children.

1. In order to terminate the parental rights of a child, a court must find clear and convincing evidence of parental misconduct or inability and that termination is in the best interest of the child. OCGA § 15-11-94 (a). Parental misconduct or inability warranting termination may be found upon a showing that the child is deprived, that lack of proper parental care or control by the parent caused the deprivation, that the cause is likely to continue or will not likely be remedied, and that continued deprivation will or is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-94 (b) (4).

(a) The juvenile court determined that the four children were deprived and that decision has not been appealed, therefore the parents are bound by that determination. *In the Interest of I. G.*, 285 Ga. App. 162, 164 (a) (i) (645 SE2d 649) (2007). In addition, the parents had never paid any support, cannot feed their children, and appear to be losing interest in visiting them.

(b) There was sufficient evidence to show that lack of proper parental care or control by the parents caused the deprivation. The evidence supports the finding that the parents were unable to provide for the children's basic necessities of life and that the mother had a medically verifiable mental/emotional deficiency that renders her unable to provide adequately for the children. See OCGA § 15-11-94 (b) (4) (B) (i). Also, the goals of the parents' case plan have never changed, and it provided that they were to obtain stable housing and

employment, which they have been unable to accomplish. And the parents have failed to pay support for the children.

(c) Sufficient evidence was presented to show that the cause of the deprivation was likely to continue. In fact the parents were right back where they started. At the time of the hearing, and two years after DFACS became involved, the parents had no money, inadequate housing for the children, and uncertain employment prospects. The father admitted that he could not feed his children, and both parents admitted that they could not care for them at the time. See, e.g., *In the Interest of B. C.*, 250 Ga. App. 152, 156 (2) (550 SE2d 707) (2001) (deprivation likely to continue where mother had no money and inadequate housing; had failed to pay support or meet visitation or case plan goals; and had been incarcerated). Also, the mother's mental deficiency is permanent, and therefore its effect on the children is likely to continue. See *In the Interest of M. W.*, 275 Ga. App. 849, 854 (3) (622 SE2d 68) (2005) ("DFACS is not required to provide around-the-clock assistance to enable a mentally disabled parent to care for a child in the home.") (citation and punctuation omitted). Although the father had just landed a full-time job, he did not appear to have a means of getting to work. This was indicative of the father's bad financial judgment, which showed no signs of abating. He could not explain his failure to provide for the children for the last two years and had mental health issues that contributed to his unstable employment history.

(d) Finally, sufficient evidence was presented to establish that continued deprivation will or is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-94 (b) (4) (A) (iv). The question we address is "whether the child would be harmed if returned to the parent's care and control, associated environment, and state of deprivation." (Emphasis omitted.) *In the Interest of J. K.*, 278 Ga. App. 564, 567 (1) (629 SE2d 529) (2006).

"[I]t is not automatically true that a finding that deprivation is likely to continue will support a finding that continued deprivation will harm the child." *In the Interest of J. T. W.*, 270 Ga. App. 26, 37 (2) (d) (606 SE2d 59) (2004). But in this case the parents admitted they would be unable to feed the four children and that they had insufficient housing; they also have never paid required support. Furthermore there was evidence that the children were doing well in foster care, that two of the foster parents wanted to adopt, that one of the children had an adverse reaction to seeing the parents, and that the parents had, at best, an inconsistent history of visiting the children. See *In the Interest of C. T. M.*, 278 Ga. App. 297, 302 (2) (a) (iv) (628 SE2d 713) (2006) ("[I]t is well settled that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems.") (punctuation and footnote omitted). There was

also evidence that the mother's mental condition could subject the children to harm. And although the father thought that in another three months or so he would be in a position to support the family, as we have held, "[t]he decision as to a child's future must rest on more than positive promises which are contrary to negative past fact." (Punctuation and footnote omitted.) *In the Interest of D. P.*, 244 Ga. App. 553, 558 (2) (536 SE2d 225) (2000).

In short, the trial court was authorized to conclude that the parents' continued inability to feed and house their children would cause serious harm. See, e.g., *In the Interest of H. F. G.*, 281 Ga. App. 22, 27 (1) (635 SE2d 338) (2006) (termination warranted even though case plan mostly completed because mother lacks the mental ability to care for child without around-the-clock support; she cannot independently fulfill her parenting responsibilities and had no real support; child had developmental problems, and foster parents wished to adopt); *In the Interest of K. A. S.*, 279 Ga. App. 643, 651-652 (1) (c), (d) (632 SE2d 433) (2006) (continued deprivation likely to cause harm where children's medical needs were neglected; mother was unable to provide stable housing and income sufficient to care for her children as required by case plan; and children needed permanency); *In the Interest of M. L. P.*, 236 Ga. App. 504, 508-510 (1) (512 SE2d 652) (1999) (termination affirmed where, among other things, mother lacked maturity and commitment sufficient to support or provide bare necessities for children).

We do not hold that the children would be better off elsewhere but rather that the parents are simply incapable of providing the necessities of life for these children. The definition of "deprived" includes a child lacking in "subsistence." OCGA § 15-11-2 (8) (A). "[T]he term 'subsistence' is commonly defined to cover the bare necessities required to preserve life. . . ." (Footnote omitted.) *In the Interest of J. S.*, 282 Ga. 623, 624 (652 SE2d 547) (2007).[2] And the Supreme Court long ago clarified that whereas a termination for the sole reason of giving the child "better financial, educational, or even moral advantages" is not proper, termination based on a "failure to provide" is proper. *Chapin v. Cummings*, 191 Ga. 408, 413 (12 SE2d 312) (1940).[3]

2. The court must next determine whether termination is in the best interests of the children "after considering the physical, mental,

---

[2] Black's defines "necessaries" as "[t]hings that are indispensable to living (an infant's necessaries include food, shelter, and clothing)." Black's Law Dictionary (8th ed. 2004).

[3] See also *Clark v. Wade*, 273 Ga. 587, 591 (544 SE2d 99) (2001) (regarding parental fitness, the question is "can the parent provide for the child sufficiently so that the government is not forced to step in and separate the child from the parent"; it is not proper to terminate parental rights for the reason that "the child might have better financial, educational, or even moral advantages elsewhere").

emotional, and moral condition and needs of the child[ren] . . . , including the need for a secure and stable home." OCGA § 15-11-94 (a). "The same factors which showed the existence of parental misconduct or inability also supported the finding that termination of [the mother and father's] parental rights was in the child[ren]'s best interest." (Citation omitted.) *In the Interest of B. J. F.*, 276 Ga. App. 437, 443 (2) (623 SE2d 547) (2005). We find no error here.

3. Moreover, with regard to the biological father, although he filed a petition to legitimate the children, the "[termination] action [was] subsequently concluded without a court order declaring a finding that he is the legal father of the child[ren]" as required by OCGA § 15-11-96 (i) (3), and therefore he may not now object to the termination of his rights.

> A biological father who is not the legal father loses all rights to the child and the court shall enter an order terminating all such father's rights to the child and such father may not thereafter object to the termination of his rights to the child if within 30 days from his receipt of the notice [of the termination proceeding] he . . . [f]iles a legitimation petition and the action is subsequently concluded without a court order declaring a finding that he is the legal father of the child.

OCGA § 15-11-96 (i) (3). See also *In the Interest of L. S. T.*, 286 Ga. App. 638, 639 (2) (649 SE2d 841) (2007). Accordingly, even though the father also argues that DFACS should have provided him the individual counseling recommended by Frimpong, he may not now object to the termination of his parental rights.

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED FEBRUARY 29, 2008.

*David P. Smith*, for appellants.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Elizabeth M. Williamson, Assistant Attorney General, Sanders B. Deen, Stacy S. Garguilo*, for appellee.