*Elizabeth S. Richards, Clinton A. Harkins*, for appellee.

A11A2242. IN THE INTEREST OF E. G. et al., children.
(726 SE2d 510)

BOGGS, Judge.

A juvenile court terminated the father's parental rights to his two children, five-year-old E. G. and two-year-old M. G. Following the denial of his amended motion for new trial, the father appeals, asserting several claims of error.[1] Having reviewed these claims, we find no error and affirm.

The record reveals that the Morgan County Department of Family and Children Services ("DFACS") became involved with the family in early 2009. On April 3, 2009, the juvenile court entered an order for shelter care placing the children in the custody of DFACS. This order found as fact that the mother had recently tested positive for methamphetamine, moved between several counties during the previous two weeks, did not have stable housing or employment, and

---

[1] We granted the father's application for discretionary review.

violated her safety plan by having the children's paternal grandmother remove the children from their safety resource placement without DFACS permission. The order found further that the father was incarcerated. DFACS filed a deprivation petition the same day the court signed the order for shelter care.[2] On April 14, 2009, nunc pro tunc to March 30, 2009, the juvenile court held a 72-hour hearing and entered an order on April 24, 2009, concluding that the children were deprived and awarding temporary custody of the children to DFACS.

The juvenile court, on April 24, 2009, signed an order incorporating a 30-day case plan formulated by DFACS. Although the record includes several case plan reports involving the mother, the parents' original case plan was not admitted during the termination hearing, but was later admitted at the hearing on the motion for new trial. The case plan required both parents to: attend and complete a drug/alcohol treatment program, remain drug and alcohol free, submit to random drug screens, follow any recommendations of a psychological evaluation, attend and complete parenting classes, obtain and maintain a source of income/support for the children, and obtain and maintain clean and safe housing that is large enough for the parents and children.

On September 15, 2009, the juvenile court signed a "Consent Order of Adjudication & Disposition as to the Legal Father," concluding that the children were deprived as to the father due to inadequate housing, failure to provide support due to unstable or irregular employment, domestic violence issues, and a recommendation for an outpatient alcohol treatment program. On the same day, the court signed a judicial review finding that the father missed his psychological examination, had not entered the outpatient program or domestic violence counseling, did not have housing or employment, and did not sign the case plan until August 2009, but that he had completed a DNA test, passed drug screens, visited the children, and had attended some of the parenting classes. The court found that the father had to complete the drug treatment program and domestic violence counseling, and secure safe, stable housing in order for the children to be returned to his care.

Upon motion by DFACS, the juvenile court ordered that the case be continued until March 9, 2010 due to the mother's mental health and possible drug use. The court, in a March 9, 2010 "Order on Motion for Extension/Permanency Order," found that the father did not have a stable residence, "failed treatment," did not pay child support and

---

[2] DFACS subsequently amended its deprivation petition on May 6, 2009.

had not visited the children since December 2009, and had not cooperated with DFACS. DFACS filed a petition to terminate parental rights on April 21, 2010. Following a hearing, the juvenile court terminated the parental rights of both the mother and the father in an order entered on August 23, 2010. The father filed a motion for new trial, and an amended motion for new trial, which the juvenile court denied following a hearing. It is from the denial of this motion that the father appeals.

At the hearing on the petition for termination, a DFACS caseworker testified that she became involved with the case in November 2009 and at that time made several unannounced visits to the father's home with no success. The father left her a phone message in December 2009, and she was finally able to visit him at his home in April 2010. During this visit, she and the father discussed "what he needed to do" under the case plan. When she attempted to make a second visit to the father's home, the home was abandoned. When she later made contact with the father, she gave him a phone number to arrange his appointment for substance abuse treatment.

Another caseworker explained that the father "never accepted the fact why his children were removed. So, we could not get beyond that point to address any of his issues," and that although he was presented with the case plan in March 2009, he did not sign the case plan until August 2009. She stated further that she explained to the father on "four or five" occasions "what he needed to do to get his kids back," and that it never seemed to "click with him at all." The father never provided the caseworker with proof of employment or housing, or proof that he completed substance abuse counseling. The caseworker noted that the father called her maybe "once or twice" about the children. The father's last visit with the children was in March 2010; DFACS had stopped providing him with transportation for the visits in November 2009. The caseworker testified that M. G. does not have any special needs, but that E. G. has been diagnosed with ADHD and is on medication.

A licensed psychologist testified that the children are attached to their foster parents who are committed to the children and plan to adopt them. She explained that E. G. "expressed feelings about his dad. He has been angry, sad, and worried about his dad for not coming for visits. He's also disclosed inappropriate physical discipline by his dad when he was living with his dad . . . [s]aid that his dad had slapped him, punched him, and hit him."[3] She recounted that on one occasion, E. G. asked her "do you know I have had six mothers?" and

---

[3] The father denied ever hitting either of the children.

that E. G. refers to his current home as "my home, my room, my mommy, my daddy, my things . . . he shows ownership of this family and the life that he has created here, or that they have created for him and with him there." She stated further that "it could be very confusing" for the children to have uncertainty about who is "going to be their mom and dad," and that for E. G. it would create frustration. The psychologist explained further that "given their young age, I think that these children have been in foster care for long enough. I do not feel like that [staying] any longer in foster care would be . . . emotionally to their advantage." The psychologist concluded that a change in placement "would be very emotionally devastating to [E. G.] if he had to leave the placement that he is at right now."

The father testified that he was arrested in 2007 for criminal trespass. He admitted he was required to undergo a psychological examination as part of his case plan but missed three appointments, explaining that he missed them because he was not employed at the time and had no transportation. The father also admitted he was required to complete a substance abuse assessment and an outpatient treatment program as part of his case plan, but could not do so because he later found employment and could not complete these requirements because of his work schedule. The father did, however, complete four out of eight required parenting classes, and passed all drug screens.

The father stated that he was living with his parents at the time of the hearing, but that he was "working on getting . . . a place," and had been employed for the previous five months at a manufacturing plant working 40 to 54 hours per week. He stated that he was paid about $2,300 per month with overtime, and submitted paycheck stubs at the hearing. When asked if he had paid child support, the father responded, "I haven't been notified to do that," and stated further that he did not think he needed to "complet[e] treatment." The father admitted he had not visited the children in the five months prior to the hearing, but stated it was due to his work schedule.[4] He purchased a used vehicle three months before the hearing. The father admitted during the hearing that he was not currently able to care for the children, but asked for more time to secure stable housing. He could not provide a time frame for when he would be able to care for the children stating only "[h]opefully pretty soon." The father later explained that he "realistically" needed about six months "to get on

---

[4] The father testified at the hearing on the motion for new trial that he visited the children regularly from the time DFACS took them into custody up until November 2009, when he was informed that DFACS would no longer provide him with transportation for the visitation.

[his] feet." At the conclusion of the hearing, the father's counsel requested 90 days for the father to complete the requirements of his case plan.

Following the presentation of evidence,[5] the juvenile court noted that it could not make a finding with regard to the father's ability to parent the children because the father failed to submit to the court-ordered psychological examination. The court also found that both parents have a history of drug abuse, that the father "failed significantly for a period of one year or longer to develop and maintain a parental bond with these children in a meaningful and supportive manner, to provide for their care and support." The court found further that

> the father has decided what the elements of his plan will be, and he will do what he thinks he should be doing, which is, to stay out of touch with the custodian of his children, to not have — have any meaningful supportive contact with his own child, to not pay any child support, but to work and at some day maybe in the future . . . he might be able to provide a home [for the children].

The court found that the cause of the deprivation was likely to continue because in addition to the mother's drug addiction and psychological problems, the father, "continues to have no insight into why his children were removed." With regard to whether the continued deprivation would cause harm, the juvenile court found that the father "has not completed parenting. He has not completed A&D treatment that was ordered by the Court under the case plan. He's not demonstrated that he can provide stable housing. And [he] has a lack of commitment to these children which will just continue to confuse and hurt his son emotionally."

The court concluded that termination of the parental rights of both parents was in the best interests of the children. In deciding placement for the children, the court found that relatives of the parents were either eliminated or failed to timely come forward to express an interest in the children, and that the foster parents "have demonstrated a commitment to adopt them." The court then ordered that the children be placed in the custody of DFACS for the purpose of adoption. The juvenile court's written order reflects these same

---

[5] The court-appointed special advocates did not testify at the termination hearing. And the guardian ad litem stated only that she recommended the court terminate the parental rights of both parents and that the children be placed with DFACS for adoption.

findings of fact and conclusions of law.

1. The father argues that the juvenile court erred in relying on, and referring to, the father's case plan "even though the case plan was never entered into evidence, does not otherwise appear in the record in connection with a previous proceeding . . . and no one ever specifically testified as to its contents." But although the father's case plan was not admitted into evidence during the termination hearing, details of the case plan were confirmed by the testimony of a parent aide, a caseworker, and the father himself. And in a judicial review made a part of the record, the juvenile court listed the requirements of the plan and the father's status on completing those requirements. Under OCGA § 15-11-65 (b), formerly OCGA § 15-11-33 (d), "all information helpful in determining whether the children are deprived, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent in the hearing on the petition." (Punctuation omitted.) *In the Interest of M. L. P.*, 236 Ga. App. 504, 510 (2) (512 SE2d 652) (1999). At the hearing on the motion for new trial, the juvenile court allowed DFACS to enter into evidence the father's case plan, a caseworker testified to the requirements of the plan, and the father acknowledged that he signed it. Under these circumstances, we find no ground for reversal. See id. at 511 (2); *In the Interest of D. T.*, 251 Ga. App. 839, 843-844 (1) (555 SE2d 215) (2001) (case plan details were corroborated by testimony of caseworkers and appellants).

2. The father argues that the juvenile court erred in finding clear and convincing evidence that the children were presently deprived, that the cause of the deprivation was likely to continue, and that the continued deprivation of the children was likely to cause "serious physical, mental, emotional, or moral harm." See OCGA § 15-11-94 (b) (4) (A) (i), (iii), and (iv).

> In considering a challenge to the sufficiency of the evidence in a termination of parental rights case, the question is whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. In making that determination, this Court reviews the evidence in a light most favorable to the lower court's judgments and we neither weigh evidence nor determine the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met.

(Citation and punctuation omitted.) *In the Interest of M. L.*, 290 Ga. App. 437, 438 (659 SE2d 800) (2008). And in order to terminate a parent's rights as to a child,

> the court shall first determine whether there is present clear and convincing evidence of parental misconduct or inability. . . . If there is clear and convincing evidence of such parental misconduct or inability, the court shall then consider whether termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child who is the subject of the proceeding, including the need for a secure and stable home.

OCGA § 15-11-94 (a). The court makes a determination regarding parental misconduct or inability by finding that the children are deprived, the lack of proper parental care or control by the parent in question is the cause of the children's status as deprived, the cause of deprivation is likely to continue or will not likely be remedied, and the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the children. OCGA § 15-11-94 (b) (4) (A).

Here, the father does not challenge the finding regarding the second factor (lack of proper parental care or control), nor does he challenge the court's finding that termination was in the best interests of the children. We therefore limit our analysis to a consideration of only the challenged findings. See *In the Interest of M. L.*, supra, 290 Ga. App. at 439.

(a) The father argues that the juvenile court erred by finding clear and convincing evidence of present deprivation. See OCGA § 15-11-94 (b) (4) (A) (i).

> Where, as here, the children have been removed from parental custody, [DFACS] may prove current deprivation by showing that, if the children were returned to their [father] at the time of the hearing, they would be deprived. This may be established by showing that the conditions upon which an earlier finding of deprivation was based still exist at the time of the termination hearing.

(Citations and footnotes omitted.) *In the Interest of Z. H. T.*, 302 Ga. App. 424, 429 (1) (a) (691 SE2d 292) (2010).

Here, the juvenile court found specifically with regard to current deprivation: "There was a finding by this Court dated September

15th '09. That finding has not been appealed, but there are other factors . . . supporting deprivation. The Court finds that drug abuse by the mother, instability of both parents, irregular employment, neglect, and [in]adequate housing." The father's own testimony, that he was unable at the time of the termination hearing to care for the children and did not have stable housing, is sufficient to show that the children were presently deprived within the meaning of OCGA § 15-11-2 (8) (A) (Child is deprived if he is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals."). See *In the Interest of P. D. W.*, 296 Ga. App. 189, 193 (1) (a) (674 SE2d 338) (2009) (current deprivation found for same reasons as alleged in most recent petition: mother not in treatment for drug issues, did not have stable housing, and paid no child support); see also *In the Interest of T. B.*, 267 Ga. App. 484, 486-487 (1) (600 SE2d 432) (2004) (father's failure to support child, even in absence of order directing father to pay specific amount is compelling evidence he is not an able parent).

(b) The father contends that there was a lack of clear and convincing evidence to show that the cause of the deprivation was likely to continue. See OCGA § 15-11-94 (b) (4) (A) (iii). "In determining whether conditions of deprivation are likely to continue, the court may consider the past conduct of the parent." (Citation omitted.) *In the Interest of J. C.*, 237 Ga. App. 533, 535-536 (1) (515 SE2d 847) (1999). And "the question how much weight should be given to a parent's recent improvements is a question for the trier of fact. In considering a parent's claims of recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation." (Citation and punctuation omitted.) *In the Interest of J. E.*, 309 Ga. App. 51, 56 (1) (c) (711 SE2d 5) (2011).

The father argues that because he made some progress on his case plan and had been employed for the five months before the hearing, and because he had visited with the children regularly until DFACS stopped providing him with transportation, the court erred in finding that the cause of the deprivation was likely to continue. But evidence was also presented that the father failed to complete his case plan and made no effort to do so even after he became employed and purchased a vehicle, failed to cooperate with and communicate with his caseworkers consistently, failed to visit the children at any time in the five months before the hearing even though he had transportation to do so, and failed to support them in any meaningful way during the nearly seventeen months the children were in the custody of DFACS.

The father also contends that he was never asked or ordered to

pay child support. But the "father's failure to support his child, even in the absence of an order directing the father to pay a specific amount for the child's support, is compelling evidence that the father is not an able parent." (Citation omitted.) *In the Interest of T. B.*, supra, 267 Ga. App. at 486-487 (1); see *In the Interest of K. B. E.*, 291 Ga. App. 75, 78 (661 SE2d 217) (2008) (Georgia law requires parent to support child financially while child in foster care).

Although the father testified that he needed more time to secure stable housing, "[a] plea for more time to improve is without force to overcome the proof of unrelieved detriment already suffered by the child." *In the Interest of J. C.*, supra, 237 Ga. App. at 536 (1). He made little or no effort to complete the case plan even after the caseworker informed him what was needed before the children could be returned to him. The father simply never accepted the importance of completing the plan, nor did he understand the importance of supporting the children and visiting and developing a bond with them despite his work schedule.

There was clear and convincing evidence to support the juvenile court's finding that the children's deprivation was likely to continue. See *In the Interest of T. C.*, 302 Ga. App. 693, 696 (1) (691 SE2d 603) (2010) (finding that deprivation likely to continue supported by evidence of failure to cooperate with DFACS, and failure to consistently visit with children); *In the Interest of M. L.*, supra, 290 Ga. App. at 441 (3) (failure to visit children for three months, comply with case plan goals, or support children sustained finding that the deprivation would likely continue). This is particularly true where as here, the father testified at the hearing that he was still not yet ready or able to provide for the children's needs, partly because he was living with his parents and had not secured his own housing. See *In the Interest of J. C.*, supra, 237 Ga. App. at 536 (1) (father's failure to visit child regularly, stay in contact with DFACS, and to secure a safe home environment for the child supported finding that the deprivation would likely continue, particularly since the father was not ready or able to provide for child's basic needs at time of hearing).

(c) The father argues that the juvenile court erred in finding clear and convincing evidence that the continued deprivation is likely to cause serious mental, emotional, physical or moral harm to the children. See OCGA § 15-11-94 (b) (4) (A) (iv). "The question we address is whether the child would be harmed if returned to the parent's care and control, associated environment, and state of deprivation." (Citation and punctuation omitted.) *In the Interest of C. G.*, 289 Ga. App. 844, 853 (1) (d) (658 SE2d 448) (2008). "[T]he same facts authorizing a finding that deprivation is likely to continue *may* also authorize a finding, under the circumstances of an individual

case, that the continued deprivation is likely to cause serious harm." (Citation omitted; emphasis in original.) *In the Interest of J. E.*, supra, 309 Ga. App. at 57 (1) (d). Moreover,

> our law requires a juvenile court to consider *not only* the relationship between the parent and child at the time of the termination hearing, *but also* what might happen if the child were returned to the parent given the likelihood that the deprivation under which the child has been suffering would continue after a reunion with that parent.

(Emphasis in original.) Id. at 58 (1) (d).

Here, the record reveals no evidence of a bond between the father and the children. In fact, the only evidence of the father's relationship with the children was a psychologist's testimony that E. G. was "angry, sad, and worried about his dad for not coming for visits," and that E. G. told the psychologist that the father hit, slapped and punched him while disciplining him. M. G., only nine months old when she was placed in DFACS custody and age two at the time of the hearing, had only visited with her father twice in 2010. The lack of evidence showing a bond between the father and the children is underscored in this case by the father's failure to visit them for the five months before the termination hearing when he had his own transportation, and his failure to provide support for the children in any meaningful way during the nearly seventeen months they were in DFACS custody. Moreover, evidence that the children are thriving and have a strong bond with their foster parents who intend to adopt them, and that E. G. would be emotionally devastated if removed from his foster home, shows that the children would likely suffer harm if returned to the father. See *In the Interest of A. E. S.*, 310 Ga. App. 667, 670 (714 SE2d 148) (2011); *In the Interest of J. L. C.*, 292 Ga. App. 763, 768 (666 SE2d 98) (2008) (prolonged foster care harmful where child in foster care since birth and no evidence of parental bond between father and child). "We have previously held that where evidence shows no parental bond between parent and child, the child has adapted well to foster care, and the foster parents wish to adopt, this is sufficient to support the conclusion that continued deprivation is likely to harm the child." (Citations and punctuation omitted.) *In the Interest of D. D. B.*, 282 Ga. App. 416, 420 (1) (638 SE2d 843) (2006). Although the father testified that he needed more time to be able to care for the children, "the decision as to a child's future must rest on more than positive promises which are contrary to negative past fact." (Citation and punctuation omitted.) *In the Interest of C. G.*, supra, 289 Ga. App. at 854 (1) (d).

3. Finally, the father contends that he received ineffective assistance of counsel. In order to prevail on an ineffective assistance claim, "appellant must show that [his] trial counsel's performance was deficient and that the deficient performance prejudiced [him]." *In the Interest of S. N. H.*, 300 Ga. App. 321, 329 (5) (685 SE2d 290) (2009).

> Failure to satisfy either prong of this test is fatal to an ineffective assistance claim, and we need not address the issue of deficient performance if appellant has not borne [his] burden of demonstrating prejudice . . . . [A] juvenile court's finding that a parent has been afforded effective assistance of counsel will be affirmed on appeal unless that finding is clearly erroneous.

(Citations and footnotes omitted.) Id. at 330 (5).

(a) The father contends that his counsel failed to adequately investigate the case. But counsel testified at the hearing on the motion for new trial that DFACS had an open file policy and that he was privy to all of the information in the case and therefore did not think it was necessary to file discovery. Counsel stated further that he had all of the information he needed, and that he regularly communicated with the case manager. The father has therefore failed to show that counsel's performance was deficient. Additionally, the father has failed to make a proffer of any facts that further investigation would have uncovered that had not already been presented at the termination hearing or at the hearing on the motion for new trial. He therefore has failed to meet his burden of showing harm. See *Williams v. State*, 304 Ga. App. 592, 595 (4) (696 SE2d 512) (2010).

(b) The father also contends that counsel stipulated to an additional ground of deprivation not alleged in the original deprivation petition. But he has failed to state specifically to which ground he refers. It appears from the motion for new trial transcript that the father claims counsel stipulated to the fact that he failed to provide support due to unstable employment. But counsel did not recall stipulating to this ground of deprivation. Moreover, the father testified he was unemployed at some time after the children were taken into DFACS custody, and also acknowledged that he never paid child support. The father has therefore failed to show how he was prejudiced.

(c) The father also argues generally that counsel failed to subpoena witnesses. But he failed to name or present any potential witnesses at the hearing on the motion for new trial or show how the failure to subpoena unknown witnesses prejudiced him. See, e.g., *Taylor v. State*, 293 Ga. App. 551, 554 (2) (667 SE2d 405) (2008).

(d) The father's remaining grounds of ineffective assistance are waived because those grounds were not raised in his motion for new trial, his amended motion, or at the hearing on the motion. See *Nichols v. State*, 285 Ga. 784, 785 (2) (a) (683 SE2d 610) (2009) (allegation of ineffectiveness waived where it differs from ground raised below). And "[m]erely eliciting testimony in the course of a hearing, without raising any argument concerning that testimony in a motion, brief, or argument before the trial court, is insufficient to place the trial court on notice as to what is being asserted and the grounds for the assertion." *Stone v. State*, 229 Ga. App. 367, 371 (2) (494 SE2d 48) (1997).

*Judgment affirmed. Mikell, P. J., concurs. Dillard, J., concurs fully as to Division 3 and in judgment only as to Divisions 1 and 2.*

DILLARD, Judge, concurring fully as to Division 3[6] and in judgment only as to Divisions 1 and 2.

I agree with the majority's conclusion in Division 1 that the failure of the State to enter the father's case plan into the record does not provide a basis for reversal. Nevertheless, because I do not agree that a parent's compliance with a case plan is particularly relevant in determining whether or not a child is deprived or whether a parent's rights should be terminated, I concur in judgment only as to this division.

I also take no issue with the majority's ultimate conclusion that the juvenile court did not err in finding clear and convincing evidence that (1) E. G. and M. G. are currently deprived and (2) this deprivation is likely to continue. Additionally, I agree with the majority's decision that the juvenile court could have found that present clear and convincing evidence warranted the termination of the natural father's parental rights. However, I do not entirely agree with the majority's underlying reasoning in reaching these conclusions and, therefore, specially concur in judgment only as to Division 2.[7]

Specifically, I do not agree with the majority's assertion that the pertinent question in analyzing whether "the continued deprivation is likely to cause serious mental, emotional, physical or moral harm" is "whether the child would be harmed if returned to the parent's care

---

[6] Because I agree with all that is said in Division 3 of the majority's opinion, the reasoning and holding contained therein is to be treated as binding precedent of this Court and is *not* to be considered as merely physical precedent.

[7] Although the discussion that follows is as to the majority's reasoning as employed in Division 2 (c) only, much of the analysis in Divisions 2 (a) and (b) is intertwined with the reasoning I object to in Division 2 (c), and this is why I concur in judgment only as to the entirety of Division 2.

and control, associated environment, and state of deprivation." As I have previously noted,

> [t]he overarching question in a termination proceeding is not whether the child has a model parent, or even whether that parent is presently capable of taking his or her child back into custody, but is instead whether the natural parent-child relationship has been *irretrievably* damaged as a result of the parent's unwillingness or inability to care for the child—i.e., that the continuation of the natural parent-child relationship, as it *presently* exists with the child in the custody of the State, is causing or is likely to cause that child serious harm. As our Supreme Court has recently and *rightly* emphasized, "[o]ne who is subject to the termination of parental rights cannot be equated to an individual who faces an interruption of custody" because termination "is a much more severe measure" that acts as a "remedy of last resort to address *the most exceptional situation* of a deprived child and that child's continuing deprivation." Put another way, it is one thing to remove a child from a parent's custody for reasons of neglect, but quite another to permanently and irrevocably sever the natural parent-child relationship. And there is a reason for this crucial distinction: Terminating a parent's rights, and thus forever foreclosing the possibility of restoring the natural parent-child relationship, is governmental *extinguishment* of the parent and child's constitutional right to familial relations.[8]

I also disagree with the majority's suggestion that a natural parent's rights can be terminated merely because the father failed to satisfy certain elements of the State's reunification plan (e.g., securing stable employment and housing), or because he was not financially or emotionally capable of parenting his child at the time of the termination hearing.[9] I likewise do not approve of the majority's reliance "on generalized notions of permanency as a basis for terminating parental rights."[10] As I have previously explained,

> [w]hile I do not quibble with the general proposition that children need permanency (or, for that matter, the corollary

---

[8] *In the Interest of J. E.*, 309 Ga. App. 51, 61 (711 SE2d 5) (2011) (Dillard, J., dissenting) (footnote omitted).

[9] *See In the Interest of M. M. S.*, 308 Ga. App. 614, 626 (708 SE2d 570) (2011) (Dillard, J., concurring fully and specially).

[10] *In the Interest of J. E.*, 309 Ga. App. at 66 (Dillard, J., dissenting).

that long-term foster care can have ill effects), I find it troubling that many of our prior decisions upholding the termination of parental rights appear to rely, in part, on such generalizations without specifically tying them to particularized findings of fact, even though we have repeatedly held that a juvenile court is required to make *explicit* findings of fact that *the child at issue*—rather than some hypothetical child placed in the subject child's situation—will suffer or is likely to suffer *serious* harm as a result of the continued deprivation.[11]

Nevertheless, I do agree with the majority that the juvenile court was correct in terminating the father's parental rights because the record evidence shows, clearly and convincingly, that the ongoing parental relationship between the father and both E. G. and M. G. is likely to cause the children serious, *actual* harm if permitted to continue. As the majority notes, the father "failed to visit the children at any time in the five months before the hearing even though he had transportation to do so," and he likewise failed to financially provide for his children even when he had stable employment and was clearly capable of doing so.

As our Supreme Court has previously explained, it is one thing if a parent desires to care for his or her child but simply lacks the financial wherewithal or emotional capability to do so but quite another for a parent to wilfully disregard or abandon his or her parental duties.[12] Because I believe that the case sub judice is far closer to falling into the latter category rather than the former, I agree that termination of the father's parental rights was constitutionally and statutorily permissible.

DECIDED MARCH 20, 2012.

*Sara E. Adams*, for appellant.

*Samuel S. Olens, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Penny Hannah, Assistant Attorney General, Prior, Daniel & Wiltshire, Lee R. Moss*, for appellee.

---

[11] *Id.* at 66-67 (footnote omitted).

[12] *See Thorne v. Padgett*, 259 Ga. 650, 651 (386 SE2d 155) (1989).